**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| CASTLE CHEESE, INC., a <br> Pennsylvania Corporation, <br>         Plaintiff, <br>    v. <br><br> MS PRODUCE, INC., MS PRODUCE, <br> INC. t/d/b/a CVS FOODS AND CVS <br> FOODS, INC., <br>         Defendants and <br>         Third-Party Plaintiffs, <br> v. <br><br> GRATER, INC. f/k/a GRATER <br> WISCONSIN, INC., <br>         Third-Party Defendant. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> )    Civil Action No. 04-878 <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

## MEMORANDUM OPINION

CONTI, District Judge.

### *Introduction*

The instant action arises out of a dispute involving the nonpayment of invoices for

imitation cheese products. Pending before the court are motions for summary judgment filed by

the parties.

### *Background*[1]

Plaintiff Castle Cheese, Inc. ("Castle Cheese") is a Pennsylvania corporation with its

principal place of business in Portersville, Pennsylvania. (Grater's Joint Concise Statement of

Material Facts (Doc. No. 284) ¶ 1.) Castle Cheese is in the business of selling cheese and

---

[1]In light of there being three separate motions for summary judgment considered by the court, the background section of the opinion will include a brief review of the factual background generally relevant to this case. Additional facts relevant to a specific issue will be reviewed in the discussion pertaining to that issue, with those facts being viewed in the light most favorable to the relevant nonmoving party.

imitation cheese products to wholesalers for distribution. (Castle Cheese's Joint Concise Statement of Material Facts (Doc. No. 256) ¶ 1.) George Myrter ("Myrter") is the president of Castle Cheese. (Grater's Joint Concise Statement of Material Facts (Doc. No. 284) ¶ 1.) Defendant/third-party plaintiff MS Produce, Inc. ("MS Produce"), is an Illinois corporation which maintains its principal place of business in Lyons, Illinois. (*Id.* ¶ 2.) MS Produce is in the business of distributing food products. (*Id.*) James Kubeck ("Kubeck") is MS Produce's president, director, secretary and treasurer. (*Id.*) Defendant/third-party plaintiff CVS Foods, Inc. ("CVS Foods"), is an Illinois corporation which maintains its principal place of business in Lyons, Illinois. (*Id.* ¶ 3.) CVS Foods, which is operated by Kubeck, was a dormant corporation for several years before becoming active for a brief period in January 2004. (*Id.*) Third-party defendant Grater, Inc. ("Grater"), is an Illinois corporation which maintains its principal place of business in Elgin, Illinois. (*Id.* ¶ 4.) Grater is in the business of processing and distributing cheese and imitation cheese products. *Id.* At all times relevant to this case, James T. Zavacki ("Zavacki") was the president of Grater. (*Id.*)

Castle Cheese and Grater had an existing business relationship dating back to June 2001. (*Id.* ¶ 9.) Before October 2003, Zavacki and Kubeck discussed the possibility that Grater could lease warehouse space from MS Produce for the purpose of storing unprocessed imitation cheese products that were beyond the storage capacity of Grater's facility in Elgin. (*Id.* ¶ 5.) Instead of executing a lease agreement, however, they decided that Grater would contract the processing of certain imitation cheese products to MS Produce, which would then sell the products to Grater at a one percent markup. (*Id.* ¶ 6.) Castle Cheese was made aware of Grater's storage problems,

and of the need for its imitation cheese products to be sold to MS Produce, which would resale them to Grater. (*Id.* ¶ 10.)

In October 2003, MS Produce and Castle Cheese established a business relationship to facilitate MS Produce's purchase of imitation cheese products for resale to Grater. (*Id.* ¶ 11.) MS Produce began to submit order forms to Castle Cheese for imitation cheese products. (Castle Cheese's Joint Concise Statement of Material Facts (Doc. No. 256) ¶ 3.) Castle Cheese sent the products to MS Produce, which processed them and resold them to Grater. (*Id.* ¶ 4.) The products were shipped to Grater in trucks owned and operated by MS Produce. (Grater's Joint Concise Statement of Material Facts (Doc. No. 284) ¶ 15.) This arrangement continued through at least the end of 2003. (*Id.* ¶ 16.) Castle Cheese sent invoices directly to MS Produce, which paid Castle Cheese for the products. (MS Produce/CVS Foods' Joint Concise Statement of Material Facts (Doc. No. 273) ¶¶ 1-23.) Between November 3, 2003, and February 10, 2004, MS Produce paid Castle Cheese a total of $438,915.00 for imitation cheese products. (*Id.* ¶¶ 3-23.)

Exactly what happened next is vigorously disputed by the parties. Castle Cheese avers that, in January 2004, MS Produce informed Castle Cheese that it would be trading and doing business as CVS Foods. (Castle Cheese's Joint Concise Statement of Material Facts (Doc. No. 256) ¶ 6.) MS Produce and CVS Foods contend that CVS Foods entered into its own arrangement with Grater for the purpose of purchasing and processing Castle Cheese products for resale to Grater. (MS Produce/CVS Foods' Joint Concise Statement of Material Facts (Doc. No. 273) ¶ 24.) In any event, CVS Foods began to purchase unprocessed imitation cheese products from Castle Cheese in the same manner as MS Produce had done on previous occasions.

(Grater's Joint Concise Statement of Material Facts (Doc. No. 284) ¶ 17.)  Workers in Lyons, Illinois, removed the products from their packages, grated them via the use of a chopping machine, repackaged them into plastic totes, and labeled them for resale to Grater.  (*Id.* ¶ 18.)  The processed imitation cheese products were sold by CVS Foods to Grater.  They were delivered to Grater by trucks owned and operated by MS Produce.  (*Id.* ¶ 19.)  CVS Foods continued to purchase, process and deliver Castle Cheese products for Grater through February 27, 2004.  (*Id.* ¶ 21.)

MS Produce and CVS Foods operated from the same address and shared a common telephone number, although they had different extension numbers.  (Castle Cheese's Joint Concise Statement of Material Facts (Doc. No. 256) ¶¶ 10-11.)  During the relevant period of time, MS Produce had at least twenty customers in addition to Grater.  (*Id.* ¶ 46.)  Grater was CVS Foods' sole customer.  (*Id.* ¶ 47.)  MS Produce was incorporated on February 16, 1995, while CVS Foods was not incorporated until February 15, 2000.  (*Id.* ¶ 51.)  They had separate post office box numbers.  (*Id.* ¶ 52.)  They maintained separate checking accounts, accounting books and financial statements, and they did not commingle their funds.  (*Id.* ¶¶ 54-57.)  MS Produce paid the electricity, maintenance, mortgage and taxes for the property that it shared with CVS Foods in Lyons, Illinois.  (*Id.* ¶ 61.)

Grater's contact at MS Produce was Anna Kotz ("Kotz").  (Grater's Joint Concise Statement of Material Facts (Doc. No. 284) ¶ 23.)  Between October 2003 and March 2004, Kotz served as MS Produce's manager, bookkeeper and buyer.  (*Id.*)  Her job responsibilities included the management of the daily operations of MS Produce.  (*Id.*)  Grater's contact at CVS Foods was Thomas Dunham ("Dunham").  (*Id.* ¶ 24.)  He was responsible for CVS Foods' accounting

and the management of its books. (*Id.*) In February 2004, Dunham became an employee of Grater. (*Id.* ¶¶ 24-25.)

Grater placed purchase orders with MS Produce or CVS Foods for totes of processed imitation cheese by either telephone or facsimile, indicating the type and quantity that it wished to purchase. (*Id.* ¶ 26.) Upon receipt of a purchase order from Grater, MS Produce would deliver the requested totes of processed imitation cheese in increments weighing 2,000-8,000 pounds. (*Id.* ¶ 27.) After inspecting the products and verifying the applicable bills of lading, Grater accepted all shipments and deliveries of products that it had ordered from either MS Produce or CVS Foods. (*Id.* ¶ 28.)

The business relationship among these entities began to break down in March 2004. CVS Foods did not tender payment to Castle Cheese for the imitation cheese products shipped between January 27, 2004, and February 27, 2004. (Castle Cheese's Joint Concise Statement of Material Facts (Doc. No. 256) ¶ 15.) On February 27, 2004, Grater issued a check to CVS Foods in the amount of $136,028.29. (*Id.* ¶ 18.) When Kubeck received this check, he marked it with a notation reading "Per J.Z. & J.K. For Management Fee & Admin. & Transportation." (*Id.* ¶ 20.) Grater had never received invoices from CVS Foods for management, administration or transportation fees. (*Id.* ¶ 22.) The only invoices received by Grater from CVS Foods were for imitation cheese products, which were sold at a one percent markup. (*Id.*)

On March 1, 2004, MS Produce sent four invoices to CVS Foods, each of which sought payment in the amount of $7,000.00.[2] (*Id.* ¶ 24.) The next day, MS Produce sent CVS Foods an

---

[2] Castle Cheese makes reference to a fifth invoice which was entered into MS Produce's customer ledger as having been billed on February 1, 2004. (Castle Cheese's Joint Concise Statement of Material Facts (Doc. No. 256) ¶ 25.) Castle Cheese believes that it was actually sent to CVS Foods on March 1, 2004, and incorrectly entered into

invoice seeking payment in the amount of $75,000.00. (*Id.* ¶ 26.) On March 3, 2004, CVS Foods transferred $75,000.00 to MS Produce. (*Id.* ¶ 27.) At that time, Castle Cheese was owed at least $245,640.00 for imitation cheese products which had been shipped to CVS Foods. (*Id.* ¶ 31.) This amount was reduced on March 19, 2004, when imitation cheese products worth about $93,312.00 were returned to Castle Cheese. (*Id.* ¶ 32.) Castle Cheese was owed $152,328.00 after the return of these products. (*Id.* ¶ 28.) On March 29, 2004, CVS Foods transferred $21,000.00 to MS Produce. (*Id.* ¶ 29.) A few weeks later, on April 19, 2004, CVS Foods transferred another $14,000.00 to MS Produce. (*Id.* ¶ 30.) Since that time, CVS Foods has been dissolved. (*Id.* ¶ 35.) Castle Cheese has not been paid the balance due it of $152,328.00.

On June 14, 2004, Castle Cheese commenced this action against MS Produce and CVS Foods asserting subject-matter jurisdiction by reason of diversity of citizenship. (Compl. (Doc. No. 1).) Castle Cheese asserted claims for intentional nondisclosure, civil conspiracy and breach of contract against both entities, as well as a claim for intentional misrepresentation against MS Produce. (*Id.* ¶¶ 25-64.) MS Produce and CVS Foods filed a third-party complaint against Grater on August 23, 2004, alleging that any damages suffered by Castle Cheese (i.e., CVS Foods' failure to pay the balance of $152,328.00) was the result of Grater's failure to pay CVS Foods for the imitation cheese products. (Third-party Compl. (Doc. No. 7) ¶¶ 10-11.) MS Produce and CVS Foods further averred that they had been purchasing agents for Grater, thereby making Grater ultimately responsible for the debt owed to Castle Cheese.[3] (*Id.* ¶¶ 6-7.) On

the ledger. (*Id.*)

[3]MS Produce and CVS Foods filed an amended third-party complaint on July 25, 2005, averring that all of their activities in Pennsylvania had been directed and controlled by Grater. (Am. Third-party Compl. (Doc. No. 29) ¶ 19.)

August 18, 2006, Castle Cheese filed an amended complaint against MS Produce and CVS

Foods, adding claims against both entities under the Pennsylvania Uniform Fraudulent Transfer

Act ("PUFTA"), 12 Pa. Cons. Stat. § 5101 *et seq.* (Am. Compl. (Doc. No. 101) ¶¶ 73-84.)

Presently before the court are motions for summary judgment filed by Castle Cheese, MS

Produce, CVS Foods and Grater. Castle Cheese seeks summary judgment with respect to its

breach of contract claim against CVS Foods and its PUFTA claims against both MS Produce and

CVS Foods. (Castle Cheese's Mot. for Partial Summ. J. (Doc. No. 181).) MS Produce and CVS

Foods move for summary judgment with respect to all claims asserted by Castle Cheese, except

for the PUFTA claims, and with respect to their third-party claims against Grater. (MS Produce

and CVS Foods' Mot. for Summ. J. (Doc. No. 188).) Grater seeks summary judgment with

respect to the third-party claims asserted against it by MS Produce and CVS Foods. (Grater's

Mot. for Summ. J. (Doc. No. 230).) These motions are the subject of this memorandum opinion.


### *Standard of Review*

Federal Rule of Civil Procedure 56(c) provides that summary judgment may be granted if,

drawing all inferences in favor of the nonmoving party, "the pleadings, the discovery and

disclosure materials on file, and any affidavits show that there is no genuine issue as to any

material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(c). A motion for summary judgment will not be defeated by the mere existence of some

disputed facts, but will be defeated when there is a genuine issue of material fact. Anderson v.

Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). In determining whether the dispute is genuine,

the court's function is not to weigh the evidence or to determine the truth of the matter, but only

to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party.  Id. at 249.  The court is to draw all reasonable inferences in favor of the nonmoving party.  El v. Southeastern Pa. Transp. Auth., 479 F.3d 232, 238 (3d Cir. 2007)("In considering the evidence, the court should draw all reasonable inferences against the moving party.").  The United States Court of Appeals for the Third Circuit has stated:

> [I]f there is a chance that a reasonable factfinder would not accept a moving party's necessary propositions of fact, pre-trial judgment cannot be granted.  Specious objections will not, of course, defeat a motion for summary judgment, but real questions about credibility, gaps in the evidence, and doubts as to the sufficiency of the movant's proof, will.

Id.

## Discussion

## I.     Castle Cheese's Motion for Partial Summary Judgment

Castle Cheese moves for partial summary judgment with respect to three of its claims.  It seeks summary judgment with respect to its breach of contract claim against CVS Foods and with respect to its PUFTA claims against MS Produce and CVS Foods.  (Castle Cheese's Mot. for Partial Summ. J. (Doc. No. 181).)  The court will address these claims seriatim.

## A.     The Breach of Contract Claim Against CVS Foods

Since jurisdiction in this case is predicated on 28 U.S.C. § 1332(a)(1), the court must apply the choice of law rules applicable in the Commonwealth of Pennsylvania.  *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496-97 (1941).  The parties are in apparent agreement that the substantive law of Pennsylvania is applicable to Castle Cheese's breach of contract claim

against CVS Foods.[4]  Therefore, the court will analyze this claim in accordance with

Pennsylvania law.

In order to succeed on a claim for breach of contract, Castle Cheese must establish: (1)

the existence of a contract between CVS Foods and it, including the essential terms of that

contract; (2) a breach of a duty imposed by the contract on the part of CVS Foods; and (3)

damages resulting from that breach.  *Gorski v. Smith*, 812 A.2d 683, 692 (Pa. Super. Ct. 2002).  It

is undisputed that a contract existed between Castle Cheese and CVS Foods for the purchase and

delivery of imitation cheese products as of January 1, 2004.  The parties also agree that CVS

Foods did not pay Castle Cheese for imitation cheese products delivered between January 27,

2004, and February 27, 2004.  The total value of the products was $245,640.00.  (Castle Cheese's

Joint Concise Statement of Material Facts (Doc. No. 256) ¶ 31.)  On March 19, 2004, imitation

cheese products worth about $93,312.00 were returned to Castle Cheese.  (*Id.* ¶ 32.)  At the

present time, Castle Cheese is owed $152,328.00 for imitation cheese products that were

delivered to CVS Foods and never returned.  (*Id.* ¶ 28.)  Thus, Castle Cheese suffered damages in

the amount of $152,328.00 by reason of CVS Foods' failure to pay for the products.

Castle Cheese argues that since the elements of a claim for breach of contract have been

satisfied, and are not disputed by CVS Foods, it is entitled to summary judgment with respect to

its breach of contract claim against CVS Foods.[5]  CVS Foods opposes Castle Cheese's motion

---

[4]The court acknowledges that MS Produce and CVS Foods believe that the question whether they were acting as agents of Grater in their dealings with Castle Cheese is governed by Illinois law rather than by Pennsylvania law.  (Defs.' and Third-Party Pls.' Resp. in Opp'n to Castle Cheese, Inc.'s Mot. for Summ. J. (Doc. No. 211) at 3.)  The issue of agency will be discussed later.

[5]Although Castle Cheese asserts a claim against MS Produce for breach of contract, it did not move for summary judgment with respect to that claim.  It is undisputed that MS Produce paid all invoices submitted to it by Castle Cheese for imitation cheese products purchased in November and December 2003.  Castle Cheese contends

for partial summary judgment on two separate grounds. First, CVS Foods argues that it had purchased imitation cheese products from Castle Cheese and Whitehall Specialties, Inc. ("Whitehall"), a Wisconsin cheese vendor, in its capacity as an agent for Grater, and as an agent is not liable for the unpaid bills from Castle Cheese and Whitehall for purchases made on behalf of its principal.[6] Second, CVS Foods contends that *it* does not owe Castle Cheese any money at this time because of an alleged "settlement and accord" agreement entered into between Kubeck and Myrter, and that its obligation to pay Castle Cheese will not arise until it receives additional payments from Grater. The court will separately address each of these arguments.

**1. Whether CVS Foods Acted as Grater's Agent**

**a. General Principles**

The question whether CVS Foods purchased products from Castle Cheese on its own behalf, or only on behalf of Grater as a purchasing agent, is of critical importance to this case. As a general matter, "[a]n agent is one who undertakes to manage the affairs of another, on the authority and for the account of the latter, who is called the principal, and to render an account to the principal." *Eychaner v. Gross*, 779 N.E.2d 1115, 1134 (Ill. 2002). The burden of establishing the existence of an agency relationship is on the party asserting it. *Goodway Mktg., Inc. v. Faulkner Adver. Ass'n., Inc.*, 545 F.Supp. 263, 267 (E.D.Pa. 1982). In this case, there are two distinct issues with respect to the question of agency. The first issue is whether an agency relationship between Grater and CVS Foods existed in fact. If an agency relationship existed, a

---

that MS Produce is liable for breach of contract as the alter ego of CVS Foods. (Am. Compl. (Doc. No. 101) ¶¶ 53-56.)

[6]Although Whitehall is not a party in this case, its relationships with Grater, MS Produce and CVS Foods appear to have mirrored those of Castle Cheese in many respects.

second issue for consideration is whether this relationship was disclosed to Castle Cheese during the relevant period of time. An authorized agent who contracts with a third party on behalf of a principal is generally not liable to the third party, since the law does not view the agent as a party to the contract. *Viso v. Werner*, 369 A.2d 1185, 1187 (Pa. 1977). An agent who enters into a contract on behalf of a principal without disclosing that it is acting for the principal, however, is personally liable on the contract. *Burton v. Boland*, 489 A.2d 243, 245 (Pa. Super. Ct. 1985). In order to avoid liability under a contract on the basis of an agency relationship, an agent must disclose to the other contracting party (i.e., the third party) both the *fact* of agency and the *name* of its principal. *Pa. R.R. v. Rothstein & Sons*, 165 A. 752, 755-56 (Pa. Super. Ct. 1933). A third party may hold an agent liable for breach of contract if the agent either fails to disclose that it is acting on behalf of *a principal* or fails to disclose the name of the *specific principal* that is a party to the agency agreement. *Schelly v. Gribbin*, 53 A.2d 862, 863 (Pa. Super. Ct. 1947). "Disclosure of the agency relationship and of the principal's identity must occur *before* the contract is finalized. Subsequent disclosure will not relieve the agent of liability." *N. Am. Commc'ns, Inc. v. Barry Blau & Assoc., Inc. (In re N. Am. Commc'ns Inc.)*, 154 B.R. 450, 454 (Bankr.W.D.Pa. 1993)(emphasis in original). Under the circumstances of this case, CVS Foods can avoid liability for the $152,328.00 owed to Castle Cheese by establishing that 1) it purchased and processed imitation cheese products as an agent of Grater *and* 2) Castle Cheese was aware of the agency relationship between Grater and CVS Foods.

### b. Applicable Law

Unlike the issue of the breach of contract, the parties appear to disagree about whether the issue of agency is governed by the law of Pennsylvania or the law of Illinois. Castle Cheese

contends that there is no material difference between the law of Pennsylvania and the law of Illinois with respect to the issue of agency. CVS Foods argues that a conflict of laws exists because an agency relationship exists in Illinois where a principal has the *right to control* the work of the agent, whereas an agency relationship exists in Pennsylvania only where a principal exerts *actual control* over the work of the agent. As a federal court with jurisdiction over a case based upon diversity of citizenship, the court must apply Pennsylvania's choice of law rules in order to determine the applicable law.[7] *Klaxon Co.*, 313 U.S. at 496-97.

The first step in any choice of law inquiry is to determine whether a conflict exists between the laws of the relevant jurisdictions. *Budtel Assocs., LP, v. Cont'l Cas. Co.*, 915 A.2d 640, 645 (Pa. Super. Ct. 2006). If the laws of the competing jurisdictions are essentially the same, there is no need for further analysis, and the court may interchangeably refer to legal principles from both jurisdictions. *Hammersmith v. TIG Ins. Co.*, 480 F.3d 220, 229-30 (3d Cir. 2007). Whether there is a material difference between the law of Pennsylvania and the law of Illinois with respect to the issue of agency is the threshold question here.

CVS Foods focuses on the difference between the "right to control" test, which it contends is the test for agency in Illinois, and the "actual control" test, which it asserts is the test for agency in Pennsylvania. The applicable judicial precedents reveal that, while the semantics differ between Illinois and Pennsylvania, the laws in these two jurisdictions do not differ in any significant way relevant to this case. In many jurisdictions, courts have distinguished between "agents" and "independent contractors" by reference to whether the alleged principal maintains

---

[7]As noted earlier, the parties do not appear to dispute that the issue of the breach of contract, as opposed to the issue of agency, is governed by Pennsylvania law.

the right to control the day-to-day operations of the alleged agent, or whether it merely retains the right to insist upon a particular end result. *Foothill Capital Corp. v. Clare's Food Mkt., Inc.*, 113 F.3d 1091, 1099 (9th Cir. 1997)("The other important aspect in determining the existence of an agency relationship is the degree of control exercised by the principal over the activities of the agent. The right to control, rather than its exercise, is sufficient to meet this standard. If control may be exercised only as to the result of the work and not the means by which it is accomplished, however, an independent contractor relationship exists.")(internal citations omitted); *Figi Graphics, Inc. v. Dollar Gen. Corp.*, 33 F.Supp.2d 1263, 1266 (S.D.Cal. 1998)("If the principal has the right to control the agent's day-to-day operations, then an agency relationship exists. If, however, the principal has no control over the day-to-day operations and only has the right to dictate the end result of the agents [sic] activities, then an 'independent contractor' relationship exists.")(internal citations omitted); *Quijada Corp. v. Gen. Motors Corp.*, 253 A.2d 538, 540 (D.C. 1969)("The distributorship system has given rise to much litigation involving the issue whether distributors are independent contractors or agents of the corporation whose products they sell. Although each case must be decided on its facts, the determining factor is the corporation's right to control the day-to-day operations of the distributor.")(footnote omitted). The language in these decisions would seem to suggest that the categories of "agents" and "independent contractors" are mutually exclusive, and that an agent cannot also be an independent contractor, and vice versa.

Other courts, however, have observed that these two categories are not mutually exclusive. *See Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1437 (3d Cir. 1994)("For one thing, the court referred to 'the distinctions between employees or agents

and non-employees or independent contractors,' implying that once a representative is termed an independent contractor it is by definition a non-agent."). Illinois courts have suggested that, in some contexts, even if a person can *be* both an agent and an independent contractor at the same time, he or she can only *act* as one or the other. *Horwitz v. Holabird & Root*, 816 N.E.2d 272, 283-84 (Ill. 2004)("Irrespective of this principle, we hold that an attorney can *be* both an independent contractor and an agent, but regarding particular *conduct* is either one or the other, not both.")(emphasis added). In other contexts, Illinois courts have spoken as if there is no overlap between the categories of "agents" and "independent contractors." *Petrovich v. Share Health Plan of Ill., Inc.*, 719 N.E.2d 756, 772 (Ill. 1999)("Rather, the determination of whether a person is an agent *or* an independent contractor rests upon the facts and circumstances of each case.")(emphasis added).

Pennsylvania courts, however, have generally been careful to distinguish between principal-agent relationships and master-servant relationships. In *Moon Area Sch. Dist. v. Garzony*, 560 A.2d 1361, 1367 (Pa. 1989), the Pennsylvania Supreme Court observed that "[t]he term 'independent contractor' is more appropriately contrasted with that of 'servant' rather than [with that of] 'agent.'" This distinction has it genesis in *Commonwealth v. Minds Coal Mining Corp.*, 60 A.2d 14 (Pa. 1948), in which the Pennsylvania Supreme Court made the following observations:

> It would thus seem that control over the means of performance is not the test of agency, but is the test of the relationship of master and servant. The agent may be an independent contractor, who by contract is responsible only for the end result but who is not subject to control by the principal and whose tortions or illegal acts are not attributed to his principal. On the other hand, the agent may be an employe or servant, subject to control as to the ways and means employed, and having the capacity of making his principal liable for the tortions or unlawful acts.

> In our opinion the criterion in the present case is the fact that Bulah was the agent
> of the defendant in selling the defendant's coal. The other matters may be
> interesting but in our judgment are not controlling.

*Id.* at 20. It is clear that, under Pennsylvania law, the determining factor regarding the existence

of a master-servant relationship is whether the alleged master has the "right to control" the

*manner* of the alleged servant's work, or whether a "right to control" extends only to the *end*

*result. Feller v. New Amsterdam Cas. Co.*, 70 A.2d 299, 300-01 (Pa. 1950). In determining the

existence of a master-servant relationship, Pennsylvania courts employ the "right to control" test

concededly applicable in Illinois rather than the "actual control" test which CVS Foods believes

to be applicable in Pennsylvania. *Shay v. Flight C Helicopter Servs., Inc.*, 822 A.2d 1, 14 (Pa.

Super. Ct. 2003).

In *Myszkowski v. Penn Stroud Hotel, Inc.*, 634 A.2d 622 (Pa. Super. Ct. 1993), the

Pennsylvania Superior Court noted that several courts from other jurisdictions had not

specifically distinguished between principal-agent relationships and master-servant relationships

as the Pennsylvania courts had done. *Id.* at 625 n.3 ("While Pennsylvania courts have drawn an

important distinction between the relationships of principal and agent and master and servant,

some jurisdictions do not recognize this differentiation and use these terms interchangeably.").

Referring to the inquiry as the test for "actual agency," the superior court explained that the

relevant question concerning the existence of a master-servant relationship is "whether the

alleged master has day-to-day control over the manner of the alleged servant's performance." *Id.*

at 626. Hence, the test used in some jurisdictions to establish the existence of a principal-agent

relationship is the same test used in Pennsylvania to establish the existence of a master-servant

relationship. *Id.* at 625 n. 3 ("We note that for the purposes of our analysis, these other courts'

use of the more generic terms principal and agent, implicate the more specific legal concept of master and servant as they are defined in Pennsylvania.").[8]

Despite the language in some Illinois decisions implying that the categories of "agents" and "independent contractors" are mutually exclusive, it is clear that this language results from vague legal terminology rather than a genuine difference between the laws of Illinois and Pennsylvania. Under the law of Illinois, an entity "may be both an independent contractor and an agent with the authority both to control the details of the work and also the power to act for and to bind the principal in business negotiations within the scope of the agency." *Horwitz*, 816 N.E.2d at 279 (brackets and internal quotation marks omitted). Both the *existence* and the *scope* of the agency relationship are treated as questions of fact. *Almar Commc'ns, Ltd. v. Telesphere Commc'ns, Inc.*, 205 B.R. 535, 543 (N.D.Ill. 1997). The legal principles are common to both Pennsylvania and Illinois. Where applicable, Pennsylvania courts employ the same "right to control" test which CVS Foods asserts is applicable under Illinois law. *Shay*, 822 A.2d at 14. There is no conflict between the law of Pennsylvania and the law of Illinois with respect to the issue of agency, and the court can proceed to address the issue of agency as it relates to this case without regard to which jurisdiction's law would apply if an actual conflict existed. *Carbis Walker, LLP v. Hill, Barth & King, LLC*, 930 A.2d 573, 578 (Pa. Super. Ct. 2007).

### c. Existence of Agency Relationship

---

[8] The distinction between principal-agent relationships and master-servant relationships is more relevant for determining whether a principal is liable to third parties for the torts committed by its agent rather than for determining whether a principle is liable for an agent's breach of a contractual obligation. *Smith v. Exxon Corp.*, 647 A.2d 577, 580-83 (Pa.Super.Ct. 1994). Even an agent which is not a servant can sometimes bind its principal to a contract. *Basile v. H&R Block, Inc.*, 761 A.2d 1115, 1121 (Pa. 2000).

In order to establish the existence of an agency relationship, a party must show that: (1) there was a manifestation by the principal that the agent would act for it; (2) the agent accepted such an undertaking; and (3) the principal retained control of the endeavor. *Tribune-Review Publ'g Co. v. Westmoreland County Hous. Auth.*, 833 A.2d 112, 119-20 (Pa. 2003). With respect to the first element, the Pennsylvania Supreme Court observed as follows in *Basile v. H&R Block, Inc.*, 761 A.2d 1115 (Pa. 2000):

> The special relationship arising from an agency agreement, with its concomitant heightened duty, cannot arise from any and all actions, no matter how trivial, arguably undertaken on another's behalf. Rather, the action must be a matter of consequence or trust, such as the ability to actually bind the principal or alter the principal's legal relations. Indeed, implicit in the long-standing Pennsylvania requirement that the principal manifest an intention that the agent act on the principal's behalf is the notion that the agent has authority to alter the principal's relationships with third parties, such as binding the principal to a contract.

*Id.* at 1121. The third element also requires some elaboration. The principal's right to control the actions of the agent is a hallmark of an agency relationship. *Kaporovskiy v. Grecian Delight Foods, Inc.*, 787 N.E.2d 268, 272 (Ill. App. Ct. 2003). Whether an agent is a servant or an independent contractor depends upon the *degree* of control reserved by the principal. *Darlington v. County of Chester*, 607 A.2d 315, 320 (Pa. Commw. Ct. 1992)(implicitly recognizing that *some* degree of control is necessary in any agency relationship). In an agency relationship between a principal and an independent contractor, the principal's control "may be very attenuated and, as where the principal is physically absent, may be ineffective." *Smalich v. Westfall*, 269 A.2d 476, 481 (Pa. 1970)(quoting Restatement (Second) of Agency § 14, cmt. a). On the other hand, in a master-servant relationship, the principal (or master) "controls or has the right to control the *physical conduct* of the [agent (or servant)] in the performance of the

service." *Smalich*, 269 A.2d at 481 (emphasis in original)(quoting RESTATEMENT (SECOND) OF AGENCY § 2(1)). All agents are bound by the fiduciary duties of loyalty and obedience to the principal, but only servants are subject to the direct control (or right of control) of their principals with respect to the *manner* in which they perform their day-to-day tasks. *Smith v. Exxon Corp.*, 647 A.2d 577, 581-83 (Pa.Super.Ct. 1994). Since servants are agents by definition, evidence of a master-servant relationship suffices to establish the existence of an agency relationship. *Smalich*, 269 A.2d at 481.

In determining whether an agency relationship exists (on the basis of either a master-servant relationship or a principal-independent contractor relationship), a finder of fact may consider both the situation and the conduct of the parties. *Almar Commc'ns, Ltd.*, 205 B.R. at 543. Other factors for consideration may include: (1) whether the services performed by the agent constitute a distinct occupation or business; (2) the type of occupation, with reference to whether, in the locality, the work is usually done under the direction of a principal or by a specialist without supervision; (3) the skill required for the completion of the relevant tasks; (4) whether the instrumentalities, tools and place of work are supplied by the would-be principal or the would-be agent; (5) the length of time during which the services are to be performed; (6) the method of payment, whether by the time or by the job; (7) whether the work is a part of the regular business of the principal; and (8) the nature of the relationship that the parties believe to

have been created.[9]  *Stilson v. Moulton-Niguel Water Dist.*, 98 Cal.Rptr. 914, 918-19 (Cal. Ct. App. 1971).

The nature of the relationship between Grater and CVS Foods (and between Grater and MS Produce before January 1, 2004) is vigorously disputed by the parties.  A close examination of the evidence reveals that the cheese processing arrangement between Grater, MS Produce and CVS Foods was a small part of a much larger business relationship among Kubeck, Zavacki, and their respective related entities.  Kubeck is the president, sole officer and sole shareholder of K4 Enterprises ("K4").  (Kubeck Dep. 16-17, Apr. 13, 2006.)  MS Produce is jointly owned by K4 and Galt Development, Inc. ("Galt").  (*Id.* 20.)  Galt has a 65% ownership interest in MS Produce, and K4 has an ownership interest in the remaining 35%.  (*Id.*)  Galt is jointly owned by Kubeck and Butternut Group, Inc. ("Butternut").  (*Id.* 21.)  Kubeck owns 30% of Galt, while the remaining 70% is owned by Butternut.  (*Id.* at 22.)  Kubeck is Galt's sole officer.  (*Id.* 23.)  He is also the president and sole director of Butternut.  (*Id.* 26.)  Thirty percent of Butternut's Class A shares are owned by K4, and the remaining 70% are owned by the Helen M. Pannucci living trust.  (*Id.* 27.)  Helen Pannucci is Kubeck's sister.  (*Id.*)  K4 owns a building located at 8500

----

[9]Some of these factors are more relevant for determining whether a master-servant relationship exists than they are for determining whether a principal-agent relationship exists.  As noted earlier, Pennsylvania courts have been more careful than courts in other jurisdictions to distinguish between these distinct kinds of relationships.  *Myszkowski v. Penn Stroud Hotel, Inc.*, 634 A.2d 622, 625 n.3 (Pa. Super. Ct. 1993)("While Pennsylvania courts have drawn an important distinction between the relationships of principal and agent and master and servant, some jurisdictions do not recognize this differentiation and use these terms interchangeably.").  Since the issue presently before the court is whether CVS Foods had the authority to bind Grater to a *contract* with Castle Cheese (rather than whether Grater is liable for any *torts* committed by CVS Foods), what matters is whether a principal-agent relationship (and not necessarily a master-servant relationship) existed between Grater and CVS Foods.  Nevertheless, since evidence of a master-servant relationship is itself evidence of a principal-agent relationship (given that the former is one form of the latter and, hence, within a subset of the broader category), the court will consider some factors relevant to the master-servant inquiry for purposes of the instant motions for summary judgment even though CVS Foods need not establish the existence of a master-servant relationship in order to defeat Castle Cheese's motion for partial summary judgment.

West 47th Street, in Lyons, Illinois.  (*Id.* at 28.)  MS Produce is both a tenant of K4 and the only active business operating out of the building.  (*Id.* 31.)

During the early part of 2003, MS Produce began to supply food products to Arby's restaurants.  The specifications provided by Arby's included a cheese requirement.  (*Id.* 75-76.)  In order to fulfil this cheese specification, MS Produce began to purchase sliced cheese from Grater during the spring of 2003.  (*Id.* 77.)  This arrangement lasted for a period of about six months.  (*Id.*)  In November 2003, Grater and K4 entered into a consulting agreement whereby K4 would provide consulting services to Grater.  (Zavacki Dep. 32, June 19, 2006 ("First Zavacki Dep.").)  Meanwhile, discussions were underway between Kubeck and Zavacki to ameliorate storage problems experienced by Grater.  Grater's facility in Elgin did not have the capacity to store large quantities of imitation cheese products purchased from Castle Cheese and Whitehall.  (*Id.* 33.)  Adequate space was apparently available at MS Produce's facility in Lyons.  Ultimately, Kubeck and Zavacki decided that imitation cheese products from Castle Cheese and Whitehall would be processed in Lyons rather than in Elgin.  Because Grater did not have sufficient space available to store large quantities of imitation cheese products, MS Produce ultimately became the destination for products coming from Castle Cheese and Whitehall, with the understanding that such products would be resold to Grater at a one percent markup.

The parties dispute both the nature of the business relationship between Grater and MS Produce and the degree of interaction between Grater and MS Produce personnel throughout the course of that relationship.  In October 2003, a telephone conference was conducted between Kubeck, Zavacki and Myrter.  (Myrter Aff. ¶ 2, Nov. 30, 2006.)  After that conference, Grater stopped purchasing imitation cheese products directly from Castle Cheese.  In November 2003,

MS Produce began to purchase imitation cheese products from Castle Cheese for resale to Grater. Beginning on January 1, 2004, CVS Foods rather than MS Produce began to purchase the products from Castle Cheese. Regardless whether the applicable entity was MS Produce or CVS Foods, the products were processed at the Lyons facility and later transported to Grater on trucks owned and operated by MS Produce.

Castle Cheese invoiced MS Produce or CVS Foods directly for the shipments of imitation cheese products sent to the Lyons facility. The total amount invoiced to MS Produce by Castle Cheese for products shipped in November and December 2003 was $438,915.00. (Defs.' and Third-Party Pls.' Joint Concise Statement of Material Facts for Mot. for Summ. J. Against Castle Cheese (Doc. No. 273) ¶ 26.) The parties agree that MS Produce paid this amount in full. (*Id.* ¶ 27.) Castle Cheese asserts a claim against MS Produce for breach of contract on the theory that MS Produce was the alter ego of CVS Foods and, hence, responsible for CVS Foods' own breach. (Am. Compl. (Doc. No. 101) ¶¶ 53-56.) Nevertheless, Castle Cheese concedes that genuine issues of material fact exist as to that claim, moving for summary judgment only with respect to its breach of contract claim against CVS Foods. It is undisputed that Castle Cheese is owed $152,328.00 for imitation cheese products shipped to the Lyons facility between January 27, 2004, and February 27, 2004.[10] Although Castle Cheese's motion for partial summary judgment concerns only the breach of contract claim against CVS Foods, Grater's interactions with MS Produce are relevant to the court's agency analysis, since CVS Foods assumed the same intermediary role which had previously been played by MS Produce.

---

[10]Castle Cheese shipped products valued at $245,640.00 during the relevant period of time. Products worth approximately $93,312.00 were returned to Castle Cheese on March 19, 2004, thereby decreasing the debt owed to Castle Cheese to $152,328.00. (Castle Cheese's Joint Statement of Material Facts (Doc. No. 256) ¶¶ 28-32.)

Castle Cheese and Whitehall shipped imitation cheese products to the Lyons facility in 42,000-pound truckloads. ( Dunham Dep. 33, May 11, 2006 ("First Dunham Dep.").) A chopping machine owned by Grater was used to process the products. (First Zavacki Dep. 50.) Two Mexican workers operated the processing machine during a shift that began at 5:00 P.M. and concluded early the next morning (i.e., a night shift). (Kotz Dep. 95-96, Apr. 12, 2006.) In a deposition, Dunham identified these two individuals as Thomas Rivera ("Rivera") and Emilio Munoz ("Munoz"). (First Dunham Dep. 49.) It is unclear what entity could fairly be characterized as the "employer" of Rivera and Munoz. Rivera and Munoz had previously worked at Grater's facility in Elgin as employees of a staffing agency known as Elite Staffing ("Elite"). (*Id.* 50.) According to Dunham, Elite had been hired to supply Grater's workforce. (*Id.*) When MS Produce began to process imitation cheese for resale to Grater, Rivera and Munoz started to perform the required labor at the Lyons facility. None of the parties appear to know who "employed" these two workers. Kubeck testified that they were undocumented aliens and, hence, unable to cash their own paychecks. (Kubeck Dep. 65-66.) For this reason, these checks were written out to Kotz, who would then cash them and hand the money over to Rivera and Munoz. (Kotz Dep. 214-15.) Dunham testified that MS Produce or CVS Foods had invoiced Grater for the cost of labor, which was presumably the cost of paying Rivera and Munoz. (First Dunham Dep. 111.)

In his deposition, Zavacki acknowledged that Rivera and Munoz had been paid cash for their labor, but he had no recollection of Grater being invoiced for the cost of labor.[11] (First

---

[11]Zavacki testified that he did not know exactly who had operated the chopping machine at the Lyons facility. (First Zavacki Dep. 146.) Nevertheless, he indicated that he believed them to be Latino laborers, and the court understands that he was referring to Rivera and Munoz. (*Id.*)

Zavacki Dep. 150-51.)  He explained that, before MS Produce had assumed imitation cheese processing duties, Kotz had toured Grater's Elgin facility to observe the operation of the chopping machine.  (*Id.* 100-01.)  He stated that he gave Kotz no specific instructions on how the work was to be done, since it was a very simple (and self-explanatory) process to place a block of cheese into the chopping machine. (*Id.* 101.)  Zavacki also testified that he had not spoken with Rivera and Munoz during the course of their work at the Lyons facility, nor had he directed the manner in which they did their jobs.  (*Id.* 167.)  Zavacki's testimony is buttressed by the testimony of Dunham, who stated that Zavacki did not speak Spanish and, hence, could not communicate with Rivera and Munoz.  (First Dunham Dep. 129.)  Dunham further indicated that he had never observed Rivera or Munoz speaking to Zavacki on the telephone.  (*Id.*)

The testimony of Zavacki and Dunham is flatly contradicted by that of Kotz.  Kotz testified that Rivera and Munoz were in daily contact with Zavacki, who gave them their instructions via a cellular telephone.  (Kotz Dep. 50.)  She explained that Zavacki had brought the chopping machine to MS Produce's warehouse in Lyons, where Rivera and Munoz set it up. (*Id.* 51.)  According to her, nobody other than Rivera or Munoz ever chopped imitation cheese products from Castle Cheese or Whitehall.  (*Id.*)  She viewed them as Grater employees.  (*Id.* at 94.)  Kotz noted that, because Rivera and Munoz had previously worked at Grater's facility in Elgin, they knew how to operate the chopping machine, and there was no need for her to supervise their work.  (*Id.* 98.)  She also stated that Grater had provided the totes in which the pieces of processed imitation cheese were to be placed after going through the chopping machine.  (*Id.* 53, 97, 256.)  Kotz asserted that Zavacki had told her that she did not need to concern herself with the details of the work performed by Rivera and Munoz, and that her only

responsibility was to ensure that the MS Produce trucks delivered the processed imitation cheese products to Grater in a timely manner. (*Id.* 265.) Thus, there is some evidence which indicates that Grater retained control over the *manner* in which imitation cheese products were processed in Lyons rather than merely over the *end result* of the process.

There is also a conflict in the testimony between Dunham and Kotz with respect to the manner in which the imitation cheese products were transferred from Castle Cheese and Whitehall to MS Produce or CVS Foods, and then to Grater. Kotz testified that Grater personnel would fax order forms to MS Produce or CVS Foods with product identification numbers written on them. (*Id.* 52.) She further explained that, upon receipt of an order from Grater, MS Produce or CVS Foods would fax an order form to either Castle Cheese or Whitehall for an amount of imitation cheese identical to that reflected in Grater's order. (*Id.* 52-56.) Dunham's testimony, however, tells a somewhat different story. He testified that, by January 2004, CVS Foods had enough processed imitation cheese on hand in its inventory to fill an order placed by Grater on the same day on which it was placed, or on the following day. (First Dunham Dep. 13-14.) He indicated that CVS Foods had begun to anticipate what Grater's demand would be, and to acquire sufficient quantities of imitation cheese to accommodate Grater's orders. (*Id.*) According to him, the Lyons facility had a great deal of space, thereby providing CVS Foods with room to store large quantities of imitation cheese. (*Id.* 20.) This imitation cheese, he said, had a long shelf life, which enabled CVS Foods to keep an inventory without the need to worry about whether it would still be in good condition when Grater sought to purchase it. (*Id.*) Dunham explained that, when CVS Foods received orders from Grater, it would either ship totes of imitation cheese from its processed stock or process imitation cheese from the inventory that

24

had not yet been processed.  (*Id.* 27.)  Dunham described a situation in which CVS Foods was not purchasing products from Castle Cheese or Whitehall in response to specific orders from Grater, but rather in anticipation of future orders from Grater.

Dunham's employment situation adds more complexity to the issue of agency.  Dunham's employment with Kubeck's entities commenced on November 2, 2003.[12]  (First Dunham Dep. 7.) Before commencing his employment, however, he had to interview with both Kubeck and Zavacki.  (*Id.* 81.)  It was understood from the beginning that he would ultimately become an employee of Grater, and that his time with MS Produce would be designed to make him familiar with MS Produce's operations.  (*Id.*)  In accordance with this arrangement, Dunham became an employee of Grater in February 2004.  (*Id.* 79.)  This testimony indicates that, to some extent, Grater may have had control over some of MS Produce's personnel decisions, to the extent that such decisions were linked to the processing of imitation cheese at the Lyons facility for resale to Grater.

The evidence of record, viewed in the light most favorable to CVS Foods, could enable a reasonable jury to conclude that Grater exercised control (or retained the right to control) the operations of MS Produce or CVS Foods to a sufficient degree to warrant a finding that an agency relationship was created.  It is undisputed that the chopping machine used to process the imitation cheese products was owned by Grater and that the two laborers who operated the machine had been working at Grater's facility in Elgin immediately prior to being reassigned to

---

[12]The evidence of record is not sufficient for a reasonable jury to conclude which entity actually employed Dunham because Dunham himself expressed uncertainty concerning his specific employer during the relevant period of time.  (First Dunham Dep. 79.)  He testified that he had received paychecks from both MS Produce and K4 Enterprises during the relevant period of time, and that the true identity of his "employer" had been "undefined." (*Id.*)

MS Produce's facility in Lyons. None of the parties appear to understand whether Rivera and Munoz were employees of Grater, MS Produce, CVS Foods, or some other entity. Zavacki was apparently involved in MS Produce's decision to hire Dunham. Kotz testified that Grater had supplied the totes within which the processed chunks of imitation cheese were to be placed, and her testimony on this point appears to be uncontradicted. (Kotz Dep. 256.) Moreover, the record indicates that MS Produce had not been in the cheese processing business prior to the inception of its business relationship with Grater. This evidence viewed in the light favorable to MS Produce and CVS Foods, when coupled with Kotz's testimony concerning Zavacki's alleged day-to-day communications with Rivera and Munoz, is sufficient to raise a genuine issue of material fact concerning whether MS Produce and CVS Foods were acting as agents for Grater between November 2003 and March 2004. That issue will need to be resolved by a jury.

### d. Undisclosed Principal

The existence of a genuine issue of material fact concerning the existence of an agency relationship, however, does not defeat Castle Cheese's motion for partial summary judgment with respect to the breach of contract claim against CVS Foods. Assuming *arguendo* that CVS Foods was acting as an agent for Grater, Castle Cheese can nevertheless succeed in its breach of contract claim if Grater was an undisclosed (rather than a disclosed) principal. An agent who enters into a contract on behalf of an undisclosed principal is personally liable on that contract to the other contracting party. *Burton*, 489 A.2d at 245. The agent's disclosure of the principal to the third party, in order to preclude a finding of liability, must include disclosure of both the *existence* of the agency relationship and the name of the *particular principal* for whom the agent acts. *Pa. R.R.*, 165 A. at 755-56. Even if it is assumed that an agency relationship existed

between Grater and CVS Foods, Castle Cheese can hold CVS Foods liable for breach of contract if CVS Foods failed to disclose either the existence of the agency relationship or the name of its specific principal (i.e., Grater). *Schelly*, 53 A.2d at 863.

Grater was apparently running out of space to store large quantities of imitation cheese products from Castle Cheese and Whitehall. Consequently, Zavacki and Kubeck began to discuss ways in which Grater and MS Produce could cooperate with respect to the purchasing and processing of imitation cheese. Zavacki testified that the arrangement between Grater and MS Produce was designed to both ameliorate Grater's shortage of storage capacity and avoid competition between Grater and MS Produce in the imitation cheese market. (First Zavacki Dep. 46-47.) Castle Cheese appears to have been aware that the products shipped to MS Produce (and later to CVS Foods) were ultimately destined for Grater. In an affidavit, Myrter stated that it was Zavacki who had introduced Kubeck to Castle Cheese officials during a telephone conference in October 2003. (Myrter Aff. ¶ 2.) This introduction precipitated the commencement of Castle Cheese's business relationship with MS Produce. (*Id.* 3.)

While Castle Cheese knew about Grater, the crux of the inquiry is whether the *existence* of the agency relationship was disclosed to Castle Cheese (assuming *arguendo* that the relationship between Grater and MS Produce was, in fact, an agency relationship). For purposes of this analysis, it must be remembered that the burden of establishing the existence of an agency relationship rests on the party asserting that such a relationship existed. *Scott v. Purcell*, 415 A.2d 56, 61 n. 8 (Pa. 1980). The same principle applies when the issue is the *disclosure* (rather than the *existence*) of an agency relationship. "The defense of agency in avoiding contractual liability is an affirmative defense, so the burden of establishing the *disclosure* of the agency

relationship and the existence and identity of the principal is on the party asserting the affirmative defense." *Carlson Wagonlit Travel, Inc. v. Moss*, 788 N.E.2d 501, 503 (Ind. Ct. App. 2003)(emphasis added). CVS Foods admits that Castle Cheese is owed $152,328.00 for imitation cheese products that were shipped to the Lyons facility. Since CVS Foods is the party seeking to avoid liability on the basis of an agency relationship, CVS Foods bears the burden of establishing that the *fact* of agency (as well as the identity of the principal) was disclosed to Castle Cheese. *Brown v. Owen Litho Serv., Inc.*, 384 N.E.2d 1132, 1133 (Ind. Ct. App. 1979).

In his affidavit, Myrter stated that MS Produce had submitted a credit application to Castle Cheese in order to establish its own line of credit. (Myrter Aff. ¶ 4.) MS Produce subsequently began to send order forms to Castle Cheese, seeking imitation cheese products. (*Id.* ¶ 5.) Castle Cheese began to ship those products to MS Produce, along with invoices billing MS Produce for the products. (*Id.*) According to Myrter, Castle Cheese was never advised that MS Produce or CVS Foods was acting as a "purchasing agent" for Grater. (*Id.* ¶ 15.)

Kubeck testified about his first contact with Castle Cheese in his deposition, explaining that he had become aware of Castle Cheese through Grater, and that his companies had never done business with Castle Cheese prior to the fall of 2003. (Kubeck Dep. 82.) According to Kubeck's recollection, a conference call was held in October 2003 among Myrter, Zavacki, Bill Begale ("Begale"), a Grater employee, and himself. (*Id.* 86.) Kubeck described the conference call as follows:

> Q. This conference call you had with Mr. Myrter, yourself, Mr. Zavacki, and Mr. Begale in early to middle October of 2003, what was discussed?
>
> A. I think Jim introduced myself, I think, I think, or Bill. There was an introduction made between what was going on and it was very clear.

Castle knew, I knew, Grater knew that we were–our exclusive customer, so to speak, was going to be Grater, that this was simply under Grater's control. It was more of an administrative thing, an agency thing, a broker thing, as it were, and that it was being driven by space and it was being driven by what I'll call administrative considerations at Grater.

As a matter of fact, several times with Whitehall and with Castle, Jim Zavacki said, "I'll guaranty the payment" when there was a question, and that subsequently came back when George got a little nervous about the first order.

Q.    In this telephone conversation, this conference call in early or mid October, 2003, did you tell Mr. Myrter that MS Produce was going to be purchasing the cheese on behalf of Grater?

A.    At all times that I have ever talked to George, and I may have also talked to somebody else at Castle, the relationship between Grater and MS Produce and CVS Foods was always crystal clear and represented.

At that time, we indicated that MS Produce was going to buy the product. We indicated that we were going to transfer the product to the company that would be processing it until that company went live in January of 2004. And we indicated that–and we indicated that we were doing this totally 100 percent based on the product specifications of Grater.

As a matter of fact, I think it was–I think it was one of your salesman, one of the Castle salesman who said, "Why are you guys doing this? This is the same stuff that Grater buys." And we said, "We're doing this as an agent for Grater. We're just helping Grater out."

Q.    You've used a couple of different terms in your last answer, one of which was "agent." What do you mean when you use the term "agent"?

[Counsel for MS Produce and CVS Foods]:
        Objection to form to the extent it calls for a legal conclusion. Go ahead and answer to the best of your ability.

A.    Grater was in control at all times. There was never a time where we decided what product to order. There's never a time where we decided what tonnage to order. That came directly from Grater at all times. The product specs were Grater's.

> The relationship that was–the only reason we were doing this was
> because Grater ran out of room. We had no control in any of the
> things that happened. We had no other customers. We're not in
> that business at all and what I mean is is MS Produce isn't and
> CVS Foods isn't. It was simply a–it was driven by a positive
> relationship between Jim and I as a result of a long-term contract
> that K4 had entered into with Grater and vice versa.

(*Id.* 86-88.) Kubeck's testimony provides evidence that Castle Cheese knew that the products shipped to the Lyons facility were ultimately destined for Grater. The parties appear to agree that Castle Cheese was aware that the imitation cheese products shipped to MS Produce or CVS Foods were purchased for resale to Grater. Kubeck has also submitted an affidavit in which he stated that MS Produce or CVS Foods had the authority to act on behalf of Grater, and that "Castle Cheese was aware that MS Produce or CVS Foods was the purchasing agent for Grater." (Kubeck Aff. ¶¶ 12-13, November 30, 2006.)

Zavacki's description of the conference call was very different from that of Kubeck. In his deposition testimony, Zavacki testified that Myrter had been informed that, while Grater would ultimately receive the processed imitation cheese products, Grater would no longer be involved with the purchases from Castle Cheese. (First Zavacki Dep. 224-25.) Zavacki denied that there had been a discussion about an agency relationship between Grater and MS Produce. (*Id.* 225.) He further denied that he had guaranteed payment for the products purchased by MS Produce for eventual resale to Grater. (*Id.* at 226.) He specifically stated that he had told Myrter that he did *not* want to be responsible for bills incurred by MS Produce, and that Castle Cheese needed to clear its credit with MS Produce rather than with Grater. (*Id.* 226-27.)

Viewing the evidence in the light most favorable to CVS Foods, the nonmoving party, the court assumes that Zavacki stated he would guarantee payment to Castle Cheese on behalf of

Grater for the imitation cheese products purchased by MS Produce, and that Castle Cheese knew that the products would be processed pursuant to Grater's specifications. Even with these assumptions, Castle Cheese is entitled to summary judgment with respect to its breach of contract claim against CVS Foods. While Kubeck's testimony provides evidentiary support for CVS Foods' assertion that Castle Cheese knew that Grater was willing to be a guarantor, it does not establish that Castle Cheese knew that Grater was a principal (or that CVS Foods was Grater's agent).[13] Moreover, Castle Cheese's knowledge that MS Produce or CVS Foods would process the imitation cheese products in accordance with Grater's specifications does not mean that Castle Cheese knew about the (alleged) *agency* relationship. CVS Foods' evidence, even if believed, does not establish that Castle Cheese personnel knew that MS Produce or CVS Foods could bind Grater to a contract. CVS Foods admits that Castle Cheese is owed $152,328.00 for imitation cheese products that were ordered by CVS Foods, billed to CVS Foods, delivered to the Lyons facility and never returned. Thus, it can escape liability for breach of contract *only* by establishing the existence of an agency relationship of which Castle Cheese was aware. While there is a genuine dispute about whether an agency relationship actually existed, as well as evidence in the record to support CVS Foods' assertion that Castle Cheese knew the identity of Grater and that the products would be sold to Grater, there is no evidence that Castle Cheese

---

[13]The court need not credit Kubeck's testimony that Castle Cheese *knew* that CVS Foods was acting as an agent for Grater. Such testimony constitutes nothing more than a conclusion. *Oriakhi v. Wood*, CV-05-53, 2006 WL 859543, at *2 (M.D.Pa. Mar. 31, 2006)(explaining that while a district court must view the evidence in the light most favorable to the nonmoving party in disposing of a motion for summary judgment, it need not credit "mulled allegations" or "legal conclusions").

knew of the *existence* of an agency relationship.[14]  An agent must disclose both the *identity* of the

principal and the *fact* of agency in order to avoid liability under a contract.  *Pa. R.R.*, 165 A. at

755-56.  Even if CVS Foods can establish that it disclosed the former, there is no evidence that it

disclosed the latter.

With respect to whether a principal can be charged with notice of information gleaned by

one of its agents, the Pennsylvania courts adhere to the Restatement (Second) of Agency.

*Claughton v. Bear Stearns & Co.*, 156 A.2d 314, 320 (Pa. 1959); *Sarver v. North Deposit Bank*,

433 A.2d 902, 906 (Pa. Super. Ct. 1981)(Shertz, J., dissenting).  Section 268 of the Restatement

(Second) of Agency provides:

> **§ 268.  General Rule**
> (1) Unless the notifier has notice that the agent has an interest adverse to the
> principal, a notification given to an agent is notice to the principal if it is given:
>> (a) to an agent authorized to receive it;
>> (b) to an agent apparently authorized to receive it;
>> (c) to an agent authorized to conduct a transaction, with respect to matters
>> connected with it as to which notice is usually given to such an agent,
>> unless the one giving the notification has notice that the agent is not
>> authorized to receive it;
>> (d) to an agent to whom by the terms of a contract notification is to be
>> given, with reference to matters in connection with the contract; or
>> (e) to the agent of an unidentified or undisclosed principal with reference
>> to transactions entered into by such agent within his powers, until
>> discovery of the identity of the principal; thereafter as in the case of a
>> disclosed principal.
> (2) The rules as to the giving of notification to an agent apply to the giving of
> notification by an agent.

RESTATEMENT (SECOND) OF AGENCY § 268.  As noted earlier, the burden is on CVS Foods to

establish both the *existence* of its agency relationship with Grater and the *disclosure* of the

---

[14]Zavacki's alleged willingness to guarantee payment is actually inconsistent with the existence of an agency relationship, since no guarantee would have been necessary had it been apparent to Castle Cheese that MS Produce or CVS Foods could bind Grater, as a principal, to a contract in the absence of a guarantee.

agency relationship to Castle Cheese. *Carlson Wagonlit Travel, Inc.*, 788 N.E.2d at 503. Kubeck's testimony concerning his conversation with a Castle Cheese salesman does not satisfy this burden. Even if a Castle Cheese salesman knew that CVS Foods was acting as an agent for Grater, there is no evidence to support a finding that Castle Cheese should be charged with constructive notice of what its salesman knew pursuant to the criteria in section 268. The salesman is not even identified in Kubeck's testimony, making it impossible for a reasonable jury to conclude that the salesman was authorized (or apparently authorized) to receive information on behalf of Castle Cheese concerning the existence of an agency relationship between a current and former customer. Having failed to provide sufficient evidence to sustain its affirmative defense, CVS Foods cannot rely on its alleged agency relationship with Grater to avoid liability for breaching the contract with Castle Cheese.

### e. Settlement and Accord

CVS Foods raises a second defense in an attempt to defeat Castle Cheese's motion for partial summary judgment. It points to an alleged "settlement and accord" agreement signed by Myrter and Kubeck on March 17, 2004. (Defs.' and Third-Party Pls.' Resp. in Opp'n to Castle Cheese, Inc.'s Mot. for Summ. J. (Doc. No. 211) at 5-6.) This document, though barely legible, is in the record before the court. (Doc. No. 260 at 17.) When it was signed, CVS Foods owed Castle Cheese $245,640.00 for imitation cheese products. Pursuant to the agreement, CVS Foods returned some inventory to Castle Cheese on March 19, 2004, thereby decreasing its debt by $93,312.00. (Castle Cheese's Joint Concise Statement of Material Facts (Doc. No. 256) ¶ 31.) The language of the document states that CVS Foods would pay Castle Cheese the remaining balance of $152,328.00 after collecting that sum of money from Grater, and that Castle Cheese

33

would use its "best efforts" to help CVS Foods recover that amount. (Doc. No. 260 at 17.) CVS Foods contends that, since it has not received payment from Grater, it does not owe Castle Cheese the remaining balance at this time.[15]

It is worth noting that Castle Cheese disputes CVS Foods' assertion that the agreement which resulted in the return of the inventory somehow constituted a waiver of its claims in this case. In his affidavit, Myrter denied that Castle Cheese had entered into such a settlement, and he unequivocally stated that Castle Cheese did not enter into any agreement to waive its claims against CVS Foods in this case. (Myrter Aff. ¶¶ 17-18.) If the matter turned solely on the intent of the parties, it may be that summary judgment would have to be denied. Nevertheless, in this case, CVS Foods cannot rely on the defense of accord and satisfaction to avoid liability on the contract with Castle Cheese even if it is assumed that CVS Foods' factual assertions are worthy of credence.

Since accord and satisfaction is an affirmative defense, the burden is on CVS Foods to establish each element of the defense. *Brunswick Corp. v. Levin*, 276 A.2d 532, 533-34 (Pa. 1971). In order to succeed, a defendant must demonstrate that there was: (1) a disputed debt; (2) a clear and unequivocal offer of payment in full satisfaction; and (3) an acceptance and retention of the payment by the debtor. *PNC Bank, Nat. Ass'n v. Balsamo*, 634 A.2d 645, 655 (Pa. Super. Ct. 1993). Pennsylvania courts with respect to the first element of the defense require a showing of a *disputed* debt. In *Lucacher v. Kerson*, 48 A.2d 857 (Pa. 1946), the Pennsylvania Supreme Court explained:

---

[15]In his deposition, Kubeck testified that CVS Foods had signed a similar "settlement and accord" agreement with Whitehall. (Kubeck Dep. 58.)

> Where there is a dispute or disagreement between the debtor and creditor as to their respective rights, a payment tendered in full satisfaction of the other's claim operates as an accord and satisfaction if the payment is accepted and retained. On the other hand, in the absence of such a controversy, the payment of a part of the amount due under a contract, even though accepted by the creditor as in full satisfaction of the debt, does not work a discharge of the entire indebtedness, for the reason that there is no consideration for the creditor's agreement that it should so operate.

*Id.* at 857. Thus, "[a]n element essential to the defense of accord and satisfaction is an actual and substantial difference of opinion as to the amount due." *Balsamo*, 634 A.2d at 655.

In this case, there is no dispute that CVS Foods owes Castle Cheese $152,328.00. The very language of the "settlement and accord" agreement itself acknowledges that CVS Foods' return of its imitation cheese inventory *reduced* its debt from $245,640.00 to $152,328.00, but did not constitute a full payment of the debt owed by CVS Foods to Castle Cheese. Even if Castle Cheese had accepted an inventory worth $93,312.00 as full payment of CVS Foods' debt, CVS Foods would not be able to avoid liability for the remaining $152,328.00 on the basis of that agreement. Since there is no controversy between the parties as to the *amount* owed, no consideration would be present for Castle Cheese's alleged forgiveness of the remaining balance.

CVS Foods argues that the court should evaluate the agreement of March 17, 2004, pursuant to a "substituted contract" theory. Under Pennsylvania law, a substituted contract, or "novation," effectively extinguishes all rights and duties flowing from the earlier contract. *Buttonwood Farms, Inc. v. Carson*, 478 A.2d 484, 486 (Pa. Super. Ct. 1984). The burden is on CVS Foods to demonstrate that the parties intended to discharge the original contract. *M.S. Jacobs & Assocs., Inc. v. Duffley*, 303 A.2d 921, 923 (Pa. 1973); *Daniel Adams Assocs., Inc. v. Rimbach Publ'g, Inc.*, 519 A.2d 997, 1004 (Pa. Super. Ct. 1987)("The party asserting a

substituted contract, however, has the burden of proving that the parties intended to discharge the earlier agreement.").  In order to establish the existence of a novation, CVS Foods must show that: (1) the parties displaced and extinguished a valid contract; (2) a new, valid contract was substituted in place of the prior contract; (3) sufficient legal consideration was given for the new contract; and (4) both parties consented to the displacement of the prior contract and the formation of the substituted contract.  *Buttonwood Farms*, 478 A.2d at 486.

Assuming *arguendo* that CVS Foods can satisfy the first, second and fourth elements necessary to establish the existence of a novation, its showing is insufficient to satisfy the third element for the same reason that its accord and satisfaction defense cannot succeed.  In order for a novation to exist, consideration must be present.  The Pennsylvania Supreme Court's language in *Lucacher* makes it clear that a creditor does not give consideration when it accepts a partial payment as a full payment.  *Lucacher*, 48 A.2d at 857 ("On the other hand, in the absence of such a controversy, the payment of a part of the amount due under a contract, *even though accepted by the creditor as in full satisfaction of the debt*, does not work a discharge of the entire indebtedness, for the reason that *there is no consideration for the creditor's agreement that it should so operate*.")(emphasis added).  CVS Foods' return of some inventory, which was valued at $93,312.00, constituted only a partial payment of the debt owed to Castle Cheese. Consequently, Castle Cheese gave no consideration, and CVS Foods cannot establish the existence of a novation.[16]

---

[16]The court notes that CVS Foods did not make a novation-based argument in its initial brief in support of its own motion for summary judgment, and that this argument was raised for the first time in its reply brief.  Compare Defs.' and Third-Party Pls.' Memorandum in Support of Mot. for Summ. J. (Doc. No. 197) at 4-5, with Defs.' and Third-Party Pls.' Reply in Support of Mot. for Summ. J. Regarding Castle Cheese (Doc. No. 255) at 8-9.

Given CVS Foods' admission that Castle Cheese was owed $152,328.00, and because CVS Foods cannot avoid liability for breach of contract on the basis of an agency relationship with Grater, an accord and satisfaction with Castle Cheese, or a novation, the court must grant Castle Cheese's motion for partial summary judgment with respect to the breach of contract claim against CVS Foods.[17] (Castle Cheese's Mot. for Partial Summ. J. (Doc. No. 104).) CVS Foods filed a cross-motion for summary judgment with respect to this claim. (Defs.' and Third-Party Pls.' Memorandum in Support of Mot. for Summ. J. (Doc. No. 197) at 2.) Since the court has already determined that, even when the evidence is viewed in the light most favorable to CVS Foods and all inferences are drawn in its favor, Castle Cheese is entitled to summary judgment with respect to its breach of contract claim against CVS Foods, it follows *a fortiori* that CVS Foods' motion for summary judgment must be denied with respect to this claim.

**B.      The Pennsylvania Uniform Fraudulent Transfer Act Claims**

Castle Cheese moves for summary judgment with respect to its PUFTA claims against MS Produce and CVS Foods. (Castle Cheese's Mot. for Summ. J. (Doc. No. 181).) These claims center on transfers of money from CVS Foods to MS Produce in March and April 2004. On March 1, 2004, MS Produce sent CVS Foods four invoices for $7,000.00 each. (Castle Cheese's Joint Concise Statement of Material Facts (Doc. No. 256) ¶ 24.) On March 2, 2004, MS Produce sent CVS Foods an invoice seeking payment in the amount of $75,000.00. (*Id.* ¶

---

[17]The specific remedies included within Castle Cheese's proposed order are consistent with the "Terms and Conditions of Sale" which allegedly accompanied its invoices to MS Produce and CVS Foods. (Castle Cheese's Proposed Order (Doc. No. 181-2).) Kubeck and Kotz filed affidavits stating that they never received the Terms and Conditions of Sale with the invoices from Castle Cheese. (Kubeck Aff. and Kotz Aff. (Doc. No. 220).) The parties did not brief the question concerning what effect, if any, this dispute may have on the specific remedies to which Castle Cheese may be entitled. At this stage, the court holds only that Castle Cheese is entitled to the $152,328.00 for imitation cheese products delivered to the Lyons facility and never paid for.

26.)  On March 3, 2004, CVS Foods transferred $75,000.00 to MS Produce.  (*Id.* ¶ 27.)  As of

that date, Castle Cheese was owed $245,640.00 for imitation cheese products which had been

shipped to the Lyons facility between January 27, 2004, and February 27, 2004.  (*Id.* ¶ 31.)  The

debt owed by CVS Foods to Castle Cheese was, of course, reduced to $152,328.00 on March 19,

2004, when an inventory of imitation cheese valued at $93,312.00 was returned to Castle Cheese.

(*Id.* ¶ 32.)  Ten days later, CVS Foods transferred $21,000.00 to MS Produce.  (*Id.* ¶ 29.)  On

April 19, 2004, an additional $14,000.00 was transferred by CVS Foods to MS Produce.  (*Id.* ¶

30.)  CVS Foods has since been dissolved, and Castle Cheese never received the $152,328.00

that it is owed.  (*Id.* ¶ 35.)

Castle Cheese contends that the transfers of money from CVS Foods to MS Produce,

which depleted CVS Foods' only asset (i.e., the money in its bank account), constituted

violations of the PUFTA.  The relevant substantive provisions of the PUFTA provide:

> **§ 5104.  Transfers fraudulent as to present and future creditors**
>
> **(a) General rule.–**A transfer made or obligation incurred by a debtor is
> fraudulent as to a creditor, whether the creditor's claim arose before or
> after the transfer was made or the obligation was incurred, if the debtor
> made the transfer or incurred the obligation:
>
>> (1) with actual intent to hinder, delay or defraud any creditor of the
>> debtor; or
>> (2) without receiving a reasonably equivalent value in exchange for
>> the transfer or obligation, and the debtor:
>>
>>> (i) was engaged or was about to engage in a business or a
>>> transaction for which the remaining assets of the debtor
>>> were unreasonably small in relation to the business or
>>> transaction; or
>>> (ii) intended to incur, or believed or reasonably should have
>>> believed that the debtor would incur, debts beyond the
>>> debtor's ability to pay as they became due.
>
> **(b) Certain factors.–**In determining actual intent under subsection (a)(1),
> consideration may be given, among other factors, to whether:
>
>> (1) the transfer or obligation was to an insider;

(2) the debtor retained possession or control of the property transferred after the transfer;

(3) the transfer or obligation was disclosed or concealed;

(4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

(5) the transfer was of substantially all the debtor's assets;

(6) the debtor absconded;

(7) the debtor removed or concealed assets;

(8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and

(11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

### § 5105.  Transfers fraudulent as to present creditors

A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

12 PA. CONS. STAT. §§ 5104-05.  Given the language of these statutory provisions, "there are two avenues under which a court may find a fraudulent conveyance."  *Tiab Commc'ns Corp. v. Keymarket of Nepa, Inc.*, 263 F.Supp.2d 925, 934 (M.D.Pa. 2003).  In *Tiab Commc'ns*  the district court noted:

If a transfer was made with actual intent to hinder, delay or defraud any creditor of the debtor, the transfer is fraudulent under § 5104(a)(1).  If the debtor was insolvent at the time of the transfer or became insolvent as a result of the transfer and the debtor did not receive reasonably equivalent value in exchange for the transfer, the transfer is "constructively" fraudulent under § 5104(a)(2) and § 5105.

*Id.* (footnote omitted).

MS Produce and CVS Foods argue that Castle Cheese is not entitled to summary judgment with respect to its PUFTA claims because it cannot establish that they (i.e., MS Produce and CVS Foods) were "debtors" within the meaning of the PUFTA at the time of the transfers. The PUFTA defines the term "debtor" as "[a] person who is liable on a claim."[18] 12 PA. CONS. STAT. § 5101(b). In order to establish liability under the PUFTA, a plaintiff must establish that the "person" who made the transfer in question was a "debtor" within the meaning of the statutory definition. *Presbyterian Med. Ctr. v. Budd*, 832 A.2d 1066, 1073-74 (Pa. Super. Ct. 2003). The term "creditor" is defined as "[a] person who has a claim."[19] 12 PA. CONS. STAT. § 5101(b). For purposes of this analysis, Castle Cheese was a creditor during the relevant period of time.

The primary argument raised by MS Produce and CVS Foods concerning their alleged lack of amenability to suit under the PUFTA centers on their assertion that they acted only as purchasing agents for Grater. The court has already determined that CVS Foods is liable for breach of contract, and that Castle Cheese is entitled to summary judgment with respect to that claim. Thus, CVS Foods was a "debtor" of Castle Cheese when it transferred $110,000.00 to MS Produce (via three separate transfers) during March and April 2004. The plain language of the statute provides that a judgment under the PUFTA may be entered against "the first transferee of the asset or the person for whose benefit the transfer was made." 12 PA. CONS. STAT. §

---

[18]The PUFTA defines the term "person" as "[a]n individual, partnership, corporation, association, organization, government or governmental subdivision or agency, business trust, estate, trust or any other legal or commercial entity." 12 PA. CONS. STAT. § 5101(b).

[19]The PUFTA defines the term "claim" as "[a] right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured." *Id.*

5108(b)(1). Under these circumstances, MS Produce, to whom CVS Foods transferred money, is amenable to suit under the PUFTA.

A determination with respect to whether CVS Foods made the transfers at issue "with actual intent to hinder, delay or defraud" Castle Cheese must be made by reference to the nonexhaustive list of factors set forth in section 5104(b). As a "present creditor" of CVS Foods at the time of the transfers, however, Castle Cheese can also prevail under the PUFTA by establishing that the three transfers in question were constructively fraudulent under section 5105. In order to establish the existence of constructive fraud, Castle Cheese must show that CVS Foods: (1) made the transfer[s] . . . without receiving reasonably equivalent value in exchange for the transfer[s]; *and* (2)(a) was insolvent at that time, *or* (b) became insolvent as a result of the transfer . . . . 12 PA. CONS. STAT. § 5105. Under the PUFTA, "[a] debtor is insolvent if, at fair valuations, the sum of the debtor's debts is greater than all of the debtor's assets." 12 PA. CONS. STAT. § 5102(a). In this case, there is no dispute that CVS Foods was insolvent after it transferred its only assets (i.e., the money in its bank account) to MS Produce. Hence, the dispositive question is whether CVS Foods received a "reasonably equivalent value" for the $110,000.00 transferred to MS Produce in exchange for the transfers. With respect to the issue of "reasonably equivalent value," the PUFTA provides:

### § 5103.  Value
   **(a) General rule.**–Value is given for a transfer or an obligation if, in exchange for the transfer or obligation, property is transferred or an antecedent debt is secured or satisfied, but value does not include an unperformed promise made otherwise than in the ordinary course of the promisor's business to furnish support to the debtor or another person.
   **(b) Reasonably equivalent value.**–For the purposes of sections 5104(a)(2) (relating to transfers fraudulent as to present and future creditors) and 5105 (relating to transfers fraudulent as to present creditors), a person gives

reasonably equivalent value if the person acquires an interest of the debtor in an asset pursuant to a regularly conducted, noncollusive foreclosure sale or the exercise of a power of sale for the acquisition or disposition of the interest of the debtor upon default under a mortgage, deed of trust or security agreement or pursuant to a regularly conducted, noncollusive execution sale.

12 Pa. Cons. Stat. § 5103. The statutory language defining the term "reasonably equivalent value" indicates that the statutory definition is nonexclusive.

There is some confusion about which party bears the burden of proving that a debtor did not receive reasonably equivalent value for a transfer alleged to be constructively fraudulent. In *718 Arch St. Assocs., Ltd. v. Blatstein (In re Blatstein)*, 192 F.3d 88 (3d Cir. 1999), the United States Court of Appeals for the Third Circuit opined that once a PUFTA plaintiff establishes that the debtor was insolvent at the time of the transfer at issue, the burden shifts to the *transferee* to prove, by clear and convincing evidence, that the transferee gave reasonably equivalent value for the transfer. *Blatstein*, 192 F.3d at 98 ("In fact, if the grantor is in debt at the time of a transfer PUFTA places *on the grantee* the burden of proving by clear and convincing evidence either that the grantor was solvent at the time of the transfer or that the grantee had given reasonably equivalent value for the conveyance.")(emphasis in original). The court of appeals' observation, however, was dicta. *Id.* at 98 ("Furthermore, although not necessary for our result, we note that the bankruptcy court erred in its 'constructive fraud' analysis by incorrectly placing on Arch Street the burden of proving that reasonably equivalent value was *not* given for the transfer. . . .") (emphasis in original). Some courts have adhered to this dicta. *Walsh v. Gutshall (In re Walter)*, 261 B.R. 139, 143 (Bankr.W.D.Pa. 2001)("It is undisputed that debtor was in debt when he conveyed the above property to defendants. As a consequence, defendants have the burden of proving, by clear and convincing evidence, that they gave reasonably equivalent value to debtor

in exchange for the conveyance.").  Other courts have not followed the dicta.  In *Fidelity Bond &*
*Mortgage Co. v. Brand*, 371 B.R. 708, 716-22 (E.D.Pa. 2007), the United States District Court
for the Eastern District of Pennsylvania rejected the dicta in *Blatstein* as having confused the
PUFTA with its statutory predecessor, the Pennsylvania Uniform Fraudulent Conveyance Act
("PUFCA"), 39 PA. STAT. §§ 351 *et seq.* (repealed).

When the court of appeals noted that Pennsylvania law placed the burden on the
transferee to establish (by clear and convincing evidence) that it (i.e., the transferee) had given
reasonably equivalent value for the transfer, it cited its prior decision in *Elliott v. Kiesewetter*, 98
F.3d 47, 56-57 (3d Cir. 1996).  *Blatstein*, 192 F.3d at 98.  Although *Elliott* was decided after the
enactment of the PUFTA (which replaced the PUFCA), the court of appeals observed, in a
footnote, that the case was governed by the provisions of the PUFCA because the actions alleged
to have been illegal had occurred before the replacement of the PUFCA with the PUFTA.
*Elliott*, 98 F.3d at 56 n.6.  In *Blatstein*, the court of appeals did not focus on the distinction
between the PUFCA and the PUFTA, opining that the language in *Elliott* (which had been based
on the PUFCA) was applicable in *Blatstein* as well.  *Blatstein*, 192 F.3d at 98.  In *Fidelity Bond*
*& Mortgage Co.*, however, the district court rejected the dicta as having been based on a
mistaken reading of *Elliott*.  *Fidelity Bond & Mortgage Co.*, 371 B.R. at 721 ("The court in
*Blatstein IV* apparently read the *Elliott* decision as applying the PUFTA, rather than the repealed
statute, to the plaintiff's claims when it had not.  Thus, *Blatstein IV* neither governs the issue nor
supports Fidelity's position.").  The district court concluded that the drafters of the PUFTA had
intended to leave the burden of proof on the party challenging the respective transfer with respect

to each element of a constructive fraud claim. *Id.* at 716-22. In so holding, the district court relied on the following language in committee comment (6) to section 1502 of the PUFTA:

> However, certain cases applying prior Pennsylvania law have stated in effect (if rephrased in the terms used in this chapter) that if a creditor establishes that the transferor was in debt at the time of a transfer, the burden shifts to the parties seeking to uphold the transfer to establish that the transferor received reasonably equivalent value or met the financial conditions required by 12 Pa.C.S. §§ 5104(a)(2) and 5105. *Stinner v. Stinner*, 300 Pa. Super. 351, 446 A.2d 651 (1982); *In re Glenn*, 108 Bankr. 70 (Bankr.W.D.Pa. 1989). That principle is an archaism and has not been consistently followed (compare, *e.g.*, *In re Joshua Slocum, Ltd.*, 103 Bankr. 610 (Bankr.E.D.Pa. 1989), aff'd mem., 121 Bankr. 442 (E.D.Pa. 1989)), and in any event should not be followed in applying this chapter.

12 PA. CONS. STAT. § 5102, Comm. cmt.-1993, no.(6).[20] In determining that the dicta in *Blatstein* should not be followed, the district court gave considerable weight to the observations expressed in the committee comment. *Fidelity Bond & Mortgage Co.*, 371 B.R. at 716-22.

The statutory language is silent about the burden of proof in determining whether reasonably equivalent value was given in exchange for a transfer.[21] 12 PA. CONS. STAT. § 5105. While scholars and jurists often debate the value of extraneous sources of legislative intent when a statute itself does not provide an easy answer, the Pennsylvania legislature promulgated a rule of construction in 1 PA. CONS. STAT. § 1939, which provides:

> The comments or report of the commission, committee, association or other entity which drafted a statute may be consulted in the construction or application of the original provisions of the statute if such comments or report were published or otherwise generally available prior to the consideration of the statute by the General Assembly, but the text of the statute shall control in the event of conflict between its text and such comments or report.

---

[20]The member of the court authoring this opinion was the chairperson of the committee which drafted the comment.

[21]In making this observation, the court addresses only constructive fraud within the meaning of 12 PA. CONS. STAT. § 5105. There is an affirmative defense available to transferees who accept a transfer in good faith and for a reasonably equivalent value. 12 PA. CONS. STAT. § 5108(a). That affirmative defense is not presently at issue.

1 PA. CONS. STAT. § 1939.  Given this rule, the court concurs with the rationale expressed in *Fidelity Bond & Mortgage Co.*  Committee comment (6) clearly favors placing the burden of proving a lack of reasonably equivalent value on the party challenging the transfer, and there is nothing in the statutory text which suggests otherwise.[22]  A construction of the PUFTA which places the burden of proving a lack of reasonably equivalent value on the plaintiff is favored. *Kartman v. North Suburban Tree Serv., Inc.*, 354 B.R. 70, 79 (Bankr.W.D. 2006).

There are other factors which weigh in favor of the construction embraced by committee comment (6).  The party challenging a transfer as constructively fraudulent under section 548 of the Bankruptcy Code, 11 U.S.C. § 548, bears the burden of proving a lack of a reasonably equivalent value by a preponderance of the evidence.  *Mellon Bank, N.A. v. Official Committee of Unsecured Creditors of R.M.L., Inc. (In re R.M.L., Inc.)*, 92 F.3d 139, 144 (3d Cir. 1996).  Since the relevant provisions of the PUFTA were modeled after their federal counterparts, decisions construing the Bankruptcy Code are instructive in the present context.  *Fidelity Bond & Mortgage Co.*, 371 B.R. at 720.  In addition, Pennsylvania law provides that "[s]tatutes uniform with those of other states shall be interpreted and construed to effect their general purpose to make uniform the laws of those states which enact them."  1 PA. CONS. STAT. § 1927.  Courts in other jurisdictions have construed similar statutory provisions to require the party challenging a transfer as constructively fraudulent to prove by a preponderance of the evidence that the transferor failed to give the transferee reasonably equivalent value in exchange for the transfer at issue.  *Stone v. Ottawa Plant Food, Inc. (In re Hennings Feed and Crop Care, Inc.)*, 365 B.R.

---

[22]The Pennsylvania Supreme Court has acknowledged that "[o]fficial comments are to be given weight in the construction of statutes."  *Lessner v. Rubinson*, 592 A.2d 678, 680 n.4 (Pa. 1991).

868, 874-75 (Bankr.C.D.Ill. 2007); *Ellen Equip. Corp. v. C.V. Consultants & Assocs., Inc.*, 183 P.3d 940, 945 (N.M. Ct. App. 2008).

The court holds that, with respect to whether the transfers at issue were constructively fraudulent, the burden is on Castle Cheese to prove, by a preponderance of the evidence, that MS Produce did not give CVS Foods a reasonably equivalent value for the $110,000.00 in transfers challenged in this case.[23] *Fidelity Bond & Mortgage Co.*, 371 B.R. at 716-22. In determining whether a transferee gave reasonably equivalent value for a transfer, courts apply a standard similar to that applicable under the Bankruptcy Code. *Walsh*, 261 B.R. at 144. The relevant factors utilized in making such a determination include: (1) whether the value of what was transferred was equal to the value of what was received; (2) the fair market value of what was transferred and received; (3) whether the transaction took place at arm's length; and (4) the good faith of the transferee. *Grochocinski v. Knippen*, 355 B.R. 710, 726 (Bankr.N.D.Ill. 2006).

In order to evaluate the question whether the transfers at issue were fraudulent (either *actually* fraudulent or *constructively* fraudulent), the court must examine the evidence of record. The record contains documentation concerning the bases for the three payments at issue – MS Produce's customer ledger for the period of time spanning January 1, 2004, through April 19, 2004. (Kubeck Dep. Ex. 10 (Doc. No. 259 at 25).) The relevant transaction numbers are listed as 0204/AT, 11/03AT, 12/03AT, 0104/AT, 0304/AT and 030304. (*Id.*) Transaction number 030304 corresponds with the $75,000.00 payment made by CVS Foods to MS Produce on March 3, 2004. (*Id.*) The number was presumably chosen by reference to the date of the payment. The

---

[23]In an actual fraud case, the issue of reasonably equivalent value is an affirmative defense that must be established by the defendant. *Stone v. Ottawa Plant Food, Inc. (In re Hennings Feed & Crop Care, Inc.)*, 365 B.R. 868, 874-75 (Bankr.C.D.Ill. 2007).

other five transaction numbers, which include a reference to "AT," correspond with five charges of $7,000.00 each, for a total of $35,000.00. (*Id.*) These charges were apparently paid by CVS Foods to MS Produce with the $21,000.00 transferred on March 29, 2004, and the $14,000.00 transferred on April 19, 2004. (*Id.*) When viewed in relation to the other evidence of record, the five "AT" charges correspond with alleged charges for administration and transportation for the months of November 2003, December 2003, January 2004, February 2004 and March 2004.

The invoices for all six of the subject transactions are contained in the record. Invoice number 030304, which is dated March 3, 2004, is for $75,000.00. (*Id.* (Doc. No. 259 at 32).) It contains a description which reads: "For all services 11/01/03-03/31/04." (*Id.*) The five "AT" invoices all contain a description which reads: "Administration, Transportation." (*Id.* (Doc. No. 259 at 27-31).) Invoice number 0204/AT is dated February 1, 2004. (*Id.* (Doc. No. 259 at 30).) The other four "AT" invoices are all dated March 1, 2004. (*Id.* (Doc. No. 259 at 27-29, 31).) These transactions appear on the customer ledger. (*Id.* (Doc. No. 259 at 25).) Invoice number 0204/AT, which purports to charge CVS Foods $7,000.00 for administration and transportation services during the month of February 2004, appears to have been billed prior to the charges for the months of November 2003, December 2003 and January 2004, which are reflected by invoice numbers 11/03AT, 12/03AT and 0104/AT. (*Id.*) MS Produce's cash receipts journal indicates that the charges for November 2003, December 2003 and February 2004 were paid by CVS Foods via the $21,000.00 transferred on March 29, 2004, and that the charges for January 2004 and March 2004 were paid by CVS Foods via the $14,000.00 transferred on April 19, 2004. (*Id.* (Doc. No. 259 at 26).) Because the charge for February 2004 was paid by CVS Foods along with the charges for November and December 2003, Castle Cheese believes that MS Produce actually

sent invoice number 0204/AT to CVS Foods on March 1, 2004, along with the other four invoices.

The record also contains five invoices from CVS Foods to Grater which are numbered as 11/03AT, 12/03AT, 0104/AT, 0204/AT and 0304/AT. (Kubeck Dep. Ex. 11 (Doc. No. 259 at 33-37).) Each of these invoices is for $7,500.00. (*Id.*) They are dated respectively November 30, 2003, December 31, 2003, January 3, 2004, February 29, 2004, and March 31, 2004. (*Id.*) Each of these five invoices contains a description which reads: "Administration, Transportation." (*Id.*)

Relevant to the court's analysis is check number 2405, which is dated February 27, 2004. (Plaintiff's Concise Statement of Material Facts, Ex. F (Doc. No. 190).) This check, which was signed by Zavacki, constituted a payment from Grater to CVS Foods in the amount of $132,028.29. (*Id.*) At some point, the check was marked with a notation reading, "Per J.Z. & J.K. For Management Fee & Admin. & Transportation." (*Id.*) Despite this notation, the amount of the check directly corresponds with the total amount of twenty-one invoices sent from CVS Foods to Grater between February 16, 2004, and February 27, 2004, which is verified by Grater's payment history report and is a matter of record before the court. (Plaintiff's Concise Statement of Material Facts, Ex. J (Doc. No. 194 at 10-11).)

Castle Cheese contends that the transfers from CVS Foods to MS Produce on March 3, 2004, March 29, 2004, and April 19, 2004, were fraudulent within the meaning of the PUFTA. Relying on the language of section 5105, which deals with constructive fraud as to present creditors, Castle Cheese argues that the transfers were constructively fraudulent because CVS Foods did not receive reasonably equivalent value in exchange for the transfers, and because the

48

transfers left CVS Foods insolvent.  Castle Cheese also asserts that the transfers were actually fraudulent under section 5104(a)(1), given that five factors enumerated in section 5104(b) weigh in favor of its position.  Specifically, Castle Cheese points out that: (1) the transfers were to an insider; (2) the transfer was of substantially all CVS Foods' assets (i.e., the money in its bank account); (3) the value of the consideration received by CVS Foods was not reasonably equivalent to the value of the transfers (i.e., $110,000.00); (4) CVS Foods became insolvent shortly after the transfers were made; and (5) the transfers occurred shortly after CVS Foods incurred a substantial debt (i.e., the debt to Castle Cheese).  These assertions by Castle Cheese correspond directly with the first, fifth, eighth, ninth and tenth of the eleven factors specifically enumerated by the Pennsylvania legislature for determining whether a transfer is actually fraudulent under section 5104(a)(1).[24]  12 PA. CONS. STAT. § 5104(b).

In his deposition, Kubeck attempted to explain the reasons for the $7,000.00 transfers from CVS Foods to MS Produce and the $7,500.00 invoices allegedly sent by CVS Foods to Grater.  He testified as follows:

> Q.    Have you ever seen these documents before?
>
> A.    These documents look like things that had been–that had been produced as part of this.  I have no specific recollection of these documents.
>
> Q.    If you go back to the page with the Bates label MS 0213, this is an invoice dated March 1st, 2004, is that correct?
>
> A.    Yes.
>
> Q.    And it's an invoice from MS Produce to CVS Foods, is that correct?

---

[24]The enumerated factors, of course, are not the only factors that may be considered in making the determination.  12 PA. CONS. STAT. § 5104(b)("In determining whether actual intent under subsection (a)(1), consideration may be given, *among other factors*, to whether . . . .")(emphasis added).

A.    Yes.

Q.    And it is in the amount of $7,000 and the description is administration, transportation.  Did I read that correctly?

A.    Yes.

Q.    What is this invoice for?

A.    The–this invoice reflects a payment–excuse me–reflects that MS Produce wanted to be paid the $7,000 for that month for the administration, transportation, shipping services that it supplied CVS Foods to ship the product to Grater on MS Produce trucks.  That was the–that was the fee that MS Produce was charging CVS Foods for that service and CVS Foods was charging Grater $7500 for that service and CVS Foods was making a $500 profit on that service.

Q.    Was this invoice prepared at your direction?

A.    No.

Q.    Do you know who prepared this invoice?

A.    No.

Q.    You said "for that month."  What month are we talking about?

A.    The arrangement was that CVS Foods would pay MS Produce $7000 a month for shipping, transportation, administration associated with shipping CVS product to Grater on MS Produce trucks.  So there should have been five payments made during the course of this relationship approximately, totaling approximately $35,000.  The other side of the transaction, there should have been five payments–five invoices from Grater and Grater should have paid five invoices totaling $7500.

Q.    And my question, sir, was what month does this invoice correspond to?

A.    I don't know.  There's nothing on here that would indicate that.

Q.    What administration was MS Produce doing?

A.    Paperwork associated with the CVS bills of lading between CVS and Grater and between Grater and CVS and transportation.

(Kubeck Dep. 134-36.)  In a later portion of his deposition, Kubeck explained CVS Foods'

alleged reasons for transferring $75,000.00:

> Q.      If you look at the next page, MS 0210, it's an invoice from MS Produce to
> CVS Foods and it says, "For all services November 1, 2003, through
> March 31st, 2003," and the cost was $75,000.  Did I read that correctly?

> A.      Yes, you did.

> Q.      What services were being invoiced under this invoice?

> A.      It was the management services that MS Produce was supplying to CVS.
> That was the revenue stream that I testified to earlier with respect to why
> MS Produce would even be interested in such a transaction like this.
> That's what that represents.

> Q.      What management services was MS Produce providing to CVS Foods
> during this period of time?

> A.      Well, I don't think is says management services.  I think it says services.

> Q.      Sorry.  I thought your words in response to my question were
> "management services."

> A.      Yeah, services.  So that would–to me, that would imply everything that
> CVS did and utilized at the MS Produce warehouse.  I would assume that
> that $12,500 a month included manpower fees, utility fees.  I would
> assume that it–use of pallet jacks that belong to MS Produce.  That's what
> I would assume that means.

> Q.      What manpower--

> A.      It could even be rent.

> Q.      What manpower did CVS–did MS Produce provide to CVS Foods aside
> from transportation?

> A.      Dunham, Dunham's payroll, Anna's payroll, Robert Trajkovski's payroll,
> probably Ron Sandak was even in here.

Q. This covers the period of time when Dunham was a K4 employee, is that correct?

A. It also covers a time when Dunham was an MS Produce employee, that's correct.

Q. And it covers–it covers a period of time when Trajkovski was a K4 employee?

A. It also covers a period of time when Trajkovski was an MS Produce employee.

Q. Is it your testimony that this combined $75,000 is $12,500 per month for the period in question?

A. 75,000 divided by five, it sounds like about 12,500 to me.

Q. Is that–is that what MS Produce was billing CVS Food for those services, $12,500 a month?

A. This–this is what MS Produce was supposed to be billing CVS Foods. This is what–CVS Foods was supposed to recuperate that from Grater. So it was a pass-through. So if you look at this from a summary standpoint, basically the profit margin for this five-month period for CVS was supposed to be $500 a month plus a small one percent markup. The profit margin for CVS–for MS Produce was supposed to be $12,500 plus $7,000 minus whatever the expenses were attendant to that. That was the deal that I had with Zavacki.

Q. In February, 2004, and March of 2004, other than transportation, what services, if any, was MS Produce providing to CVS Foods?

A. Myself and Anna was overseeing, but mainly Anna was overseeing CVS Foods. I probably stuck my nose in from time to time, as well.

Q. Was this invoice prepared at your direction?

A. Which invoice, sir?

Q. MS 0210, the $75,000 invoice.

A. No.

> Q. Why was CVS Foods not invoiced on a monthly basis for $12,500 if that was your agreement?
>
> A. I don't know the answer to that, but I did not do any of the billing. My guess would be–my speculation would be that it was an internal snafu.

(*Id.* 139-43.) In light of Kubeck's testimony concerning his explanation for the $75,000.00 transfer from CVS Foods to MS Produce on March 3, 2004, the court takes judicial notice of the fact that a monthly fee of $12,500.00, aggregated over a period of five months, would equal $62,500.00 rather than $75,000.00.

Kubeck's testimony is contradicted by the testimony of Kotz, Dunham and Zavacki. Despite Kubeck's insistence that the invoices were not prepared at his direction, Kotz testified that she would have prepared such invoices only at the specific request of Kubeck. (Kotz Dep. 169-84.) It is not entirely clear from her testimony whether she actually *remembered* preparing them at Kubeck's direction, or whether she simply assumed that she would not have prepared them in the absence of instructions from Kubeck.

In a supplemental deposition taken after Castle Cheese filed its amended complaint, Dunham testified concerning what Kubeck had told him about CVS Foods charging Grater for imitation cheese products. He specifically stated that Kubeck had told him that the *only* charges by CVS Foods to Grater in addition to the cost of the products themselves were the one percent markup and the cost of paying Rivera and Munoz. (Dunham Dep. 70, Sept. 18, 2006 ("Supp. Dunham Dep.").) According to Dunham, there were to be no charges for administration and transportation. (*Id.*) He made it clear that he had not prepared the $7,000.00 invoices from MS Produce to CVS Foods, and that those invoices had to have been prepared after his employment with Kubeck's entities ceased in February 2004. (*Id.* 72.) He also testified that he had not

prepared the $7,500.00 invoices from CVS Foods to Grater.[25]  (*Id.* 74-75.)  Dunham explained

that administration and transportation costs had been included within the one percent markup,

and that CVS Foods had not submitted additional costs to Grater for administration and

transportation.  (*Id.* 76-77.)  He opined that MS Produce had not performed any functions for

CVS Foods that would have warranted a charge of $75,000.00.  (*Id.* 78.)    After the filing of

Castle Cheese's amended complaint, Zavacki was deposed a second time.  Zavacki testified, in

very strong terms, that he had never agreed to administrative, management or transportation

charges.  ( Zavacki Dep. 53-58, Sept. 27, 2006 ("Supp. Zavacki  Dep.").)  He declared that any

invoice bearing the word "administration" was a "bogus invoice."  (*Id.* 54-55.)  In unequivocal

terms, Zavacki accused Kubeck of fabricating invoices by testifying as follows:

> A.    After he got himself in the trick bag and realized that he needed to come
>       up with some additional invoices, he made them.
>
> Q.    What are you referring to?
>
> A.    He got caught moving money between companies, and then had to come
>       up with some invoices to try and fake it through the system as if something
>       did happen.

(*Id.* 54.)  Zavacki indicated that he was not sure whether administration and transportation costs

had been factored into the one percent markup, since he had never inquired about why CVS

Foods was charging Grater a one percent markup.  (*Id.* 57-58.)  He apparently viewed the one

percent markup as a reasonable charge, agreeing to it without insisting on an itemized breakdown

of the costs incurred by MS Produce or CVS Foods.  (*Id.*)  Zavacki stated that he was not aware

---

[25]  In his first deposition, Dunham testified that, prior to his departure from the Lyons facility in February
2004, he had been the only individual to prepare invoices on behalf of CVS Foods.  (First Dunham Dep. 114.)
Dunham also made it clear that CVS Foods had never invoiced Grater prior to January 1, 2004.  (*Id.* 113.)

of the business arrangements between MS Produce and CVS Foods, and that he could not testify about whether MS Produce had been charging CVS Foods monthly fees of $12,500.00 and $7,000.00 during the five months at issue. (*Id.* 56-57.)

In addition to refuting Kubeck's testimony concerning his agreement with Zavacki, Zavacki's insistence that he had never agreed to administrative and transportation charges also refutes the notion that check number 2405 was for administrative and transportation expenses. Dunham testified that he was the Grater employee who had authorized Grater's payment of the invoices from CVS Foods received between February 16, 2004, and February 27, 2004, which collectively equaled the amount of check number 2405. (Supp. Dunham Dep. 79.) The total amount of these invoices was $136,028.29, and that same amount was paid by Grater via check number 2405, which was signed by Zavacki on February 27, 2004. (*Id.* 79-80.) Dunham made it clear that Zavacki had never instructed him to use check number 2405 to pay for anything other than the invoices. (*Id.* 80.) Dunham indicated that Grater considered the invoices to have been paid, despite CVS Foods' assertion that check number 2405 had been written to cover only administrative and transportation expenses. (*Id.*)

There is no dispute that the three transfers at issue left CVS Foods insolvent. 12 PA. CONS. STAT. § 5105. With respect to the issue of reasonably equivalent value, there is no evidence that the value received by CVS Foods for the $75,000.00 transfer was reasonably equivalent to services provided by MS Produce even if Kubeck's testimony is believed. For instance, Kubeck testified that Zavacki and he had agreed that CVS Foods would pay a monthly management fee of $12,500.00 to MS Produce, and that the $75,000.00 transfer from CVS Foods to MS Produce on March 3, 2004, reflected the aggregate amount of that fee over a five-month

period.  (Kubeck Dep. 139-43.)  As noted earlier, Kubeck's numbers do not add up.  A monthly fee of $12,500.00, over a period of five months, would equate with a payment of $62,500.00. Even if Kubeck's testimony is taken at face value, the evidence adduced by Castle Cheese shows that no one at CVS Foods could substantiate that any services related to the $12,500.00 charge per month for the months of November 2003 and December 2003 were rendered by MS Produce.

Kubeck could not even identify the costs associated with the fee.  He testified:

Q.    Well, I think you had testified earlier, Mr. Kubeck, that the administration fees were about 25–was about 1200–$12,500 a month, is that right?

A.    No, that would be the management fee.

Q.    I'm sorry.  The management fee.

A.    And the management fee is really not the management fee.  It's for services that were provided by MS Produce.  And specifically that was the agreement that Jim Zavacki and I had to make this worthwhile for MS Produce and to help MS Produce out of its–with its finances.

Q.    Well, I just want to be a little more specific in terms of what comprised those management fees, what MS Produce costs were captured by the management fees that you've testified to.

[Objection to the question as repetitive noted on the record].

A.    I already answered that I think.

Q.    Would it have included any salary and benefits for Mr. Dunham?

[Objection to the question noted on the record].

A.    It would–it was an arrangement that Jim Zavacki and I had so as to give MS Produce an incentive for sharing its facility and it was a way in which Jim Zavacki was supplementing MS Produce–MS Produce's finances.

Q. Did you and Mr. Zavacki break down what the components of the management fee were or you just came up with that number?

A. *Came up with that number.*

(Kubeck Dep. 192-94.)(emphasis added). Regardless whether the $75,000.00 payment from CVS Foods to MS Produce was wholly gratuitous or simply an arbitrarily derived management fee, Kubeck's testimony is evidence which supports Castle Cheese's position that reasonably equivalent value was not given for the entirety of that payment.[26] The evidence of record is that CVS Foods was not operating prior to January 2004. The five-month charge could not have exceeded $62,500 (five times $12,500) and included payment for the months of November 2003 and December 2003. Since no services were provided during those two months, Castle Cheese clearly met it burden to show that at least $37,500 of the $75,000 did not have a value in services that was reasonably equivalent to the amount transferred.

It must be remembered that the PUFTA views the issue of value in light of its purpose "to protect against depletion of a debtor's estate to the prejudice of the debtor's unsecured creditors." *Walsh*, 261 B.R. at 143. Considering the evidence of record and the applicable law, the court concludes that no reasonable jury could find other than at least $37,500.00 of the amount transferred on March 3, 2004, was constructively fraudulent within the meaning of the PUFTA. The only possible basis for the fee would be for the three months (January, February, and March 2004) during which CVS Foods operated. The fee for the three-month period could equal only

---

[26]Although the burden of proof remains on the party seeking to challenge the transfer in a constructive fraud case, the burden of production may shift from one side to the other as the case progresses. *Pension Transfer Corp. v. Beneficiaries Under the Third Amendment to Fruehauf Trailer Corp. Ret. Plan No. 003 (In re Fruehauf Trailer Corp.)*, 444 F.3d 203, 217 (3d Cir. 2006).

$37,500.  Under these circumstances, Castle Cheese is entitled to summary judgment in the amount of $37,500.00 with respect to its PUFTA claims concerning the $75,000.00 transfer.

With respect to the other two transfers at issue, according to MS Produce's cash receipts journal, the $21,000.00 transferred on March 29, 2004, paid CVS Foods' administrative and transportation charges for November 2003, December 2003 and February 2004, while the $14,000.00 transferred on April 19, 2004, paid CVS Foods' administrative and transportation charges for January 2004 and March 2004.[27]  (Kubeck Dep. Ex. 10 (Doc. No. 259 at 26).)  It is undisputed that CVS Foods did not begin to purchase imitation cheese products from Castle Cheese and Whitehall (for resale to Grater) until January 2004.  It is not clear how CVS Foods could have *possibly* owed MS Produce for the months of November and December 2003.  Thus, the court concludes that no reasonable jury could find other than that $14,000.00 of the $21,000.00 transferred from CVS Foods to MS Produce on March 29, 2004, was constructively fraudulent under the PUFTA. There is a genuine issue of fact, however, with respect to whether $7,000.00 of the March 29, 2004, payment (the portion for February 2004) and the $14,000.00 payment of April 19, 2004, were given in exchange for a reasonably equivalent value, since the record contains evidence that MS Produce trucks were used to deliver CVS Foods' processed imitation cheese products to Grater during the months of January, February and March 2004.  Accordingly, Castle Cheese is entitled to summary judgment with respect to the issue of

---

[27]Kubeck's testimony, if believed, would establish that the "AT" notations listed in the cash receipts journal stand for the words "administration and transportation."  (Kubeck Dep. 134-36.)  Kubeck testified that the five $7,000.00 invoices had not been prepared at his direction, and that he did not know who had prepared them.  (*Id.* 135.)  Kotz testified that she would not have prepared the invoices without receiving specific instructions from Kubeck.  (Kotz Dep. 169-84.)  Dunham insisted that he had not prepared the invoices.  (Supp. Dunham Dep. 72.) Zavacki denied that he had ever agreed to administrative, management or transportation charges.  (Supp. Zavacki Dep. 53-58.)

constructive fraud under the PUFTA in the amount of $51,500.00, which corresponds with $37,500.00 of the $75,000.00 transfer and $14,000.00 of the $21,000.00 transfer.

Given the evidence that MS Produce provided personnel, space, transportation and delivery services to CVS Foods during the months of January, February and March 2004, the court cannot conclude as a matter of law that the transfers at issue were actually fraudulent under section 5104(a)(1). In any event, however, Castle Cheese remains free to pursue at trial its PUFTA claims under an actual fraud theory, as well as a constructive fraud theory.[28]

## II. MS Produce's and CVS Foods' Motion for Summary Judgment

### A. The Breach of Contract Claim Against MS Produce

MS Produce and CVS Foods both move for summary judgment with respect to Castle Cheese's breach of contract claims against them. The court has already concluded that Castle Cheese is entitled to summary judgment with respect to its breach of contract claim against CVS Foods, and that it follows *a fortiori* that CVS Foods is not entitled to summary judgment with respect to that claim. At this time, the court must address the breach of contract claim against MS Produce.

It is undisputed that MS Produce paid Castle Cheese a total of $438,915.00 for imitation cheese products shipped to the Lyons facility. (MS Produce/CVS Foods' Joint Concise Statement of Material Facts (Doc. No. 273) ¶¶ 3-23.) This amount was the total billed to MS

---

[28]Castle Cheese is statutorily entitled to recover "an amount equal to the value of the asset at the time of the transfer, subject to adjustment as the equities may require." 12 PA. CONS. STAT. § 5108(c). At this point, Castle Cheese is entitled to recover $51,500.00 from MS Produce and CVS Foods under the PUFTA. That amount is less than the total amount needed to satisfy the $152,328.00 debt owed to Castle Cheese. 12 PA. CONS. STAT. § 5108(b). In its proposed order, Castle Cheese also requests "interest at the rate of 6% per annum from the date of the transfers forward." Castle Cheese's Proposed Order (Doc. No. 181-2). At this stage, the court holds only that Castle Cheese is entitled to recover $51,500.00 under the PUFTA, since it is not entirely clear how Castle Cheese calculated its request for interest. Further briefing will be required in order for the court to resolve that issue.

Produce for those products. It is also undisputed that Castle Cheese is owed $152,328.00 for imitation cheese products shipped to the Lyons facility and never returned. This figure is the difference between the value of the unpaid invoices sent to CVS Foods from Castle Cheese and the value of the imitation cheese inventory returned to Castle Cheese on March 19, 2004. The question for consideration is whether MS Produce, which has paid its bills to Castle Cheese, is nevertheless liable for CVS Foods' debt to Castle Cheese on the ground that it is an alter ego of CVS Foods.

Under Pennsylvania law, the corporate form of an entity can be disregarded "when the entity is used to defeat public convenience, justify wrong, protect fraud or defend crime." *Sams v. Redevelopment Auth.*, 244 A.2d 779, 781 (Pa. 1968). This concept is commonly referred to as the "piercing" of the "corporate veil." As a general rule, the corporate form of an entity should be recognized and upheld "unless specific, unusual circumstances call for an exception." *Zubik v. Zubik*, 384 F.2d 267, 273 (3d Cir. 1967). As the Pennsylvania Superior Court noted in *First Realvest, Inc. v. Avery Builders, Inc.*, 600 A.2d 601, 604 (Pa. Super. Ct. 1991), "there is no definitive test for piercing the corporate veil." The separate form of a distinct corporate entity can be disregarded "whenever it is necessary to avoid injustice." *Rinck v. Rinck*, 526 A.2d 1221, 1223 (Pa. Super. Ct. 1987). In determining whether the corporate form should be disregarded, consideration may be given to the following factors: (1) the failure to observe corporate formalities; (2) the nonpayment of dividends; (3) the insolvency of the debtor corporation; (4) the siphoning of funds from the corporation by dominant shareholders; (5) a lack of functioning on the part of other officers and directors; (6) the absence of corporate records; (7) the use of the corporation as a mere facade for the operations of a common shareholder or shareholders; and (8)

gross undercapitalization. *Wheeling-Pittsburgh Steel Corp. v. Intersteel, Inc.*, 758 F.Supp. 1054, 1059 (W.D.Pa. 1990). These factors, however, are neither exclusive nor all-encompassing, since Pennsylvania law requires consideration of the totality of the circumstances in order to determine whether the corporate veil should be pierced. *Plastipak Packaging, Inc. v. DePasquale*, 75 Fed.App'x 86, 88 (3d Cir. 2003). Even where most of the specific factors enumerated above do not weigh in favor of piercing the corporate veil, the law recognizes "a less precise notion that the [relevant] corporations simply acted interchangeably and in disregard of their corporate separateness." *Publicker Indus., Inc. v. Roman Ceramics Corp.*, 603 F.2d 1065, 1070 (3d Cir. 1979).

The question in this case is not whether an individual should be held liable for the debt of a corporation that he or she controls, but rather whether one corporation should be held liable for the debt incurred by another corporation with which it was significantly intertwined (i.e., its "alter ego"). What matters in this instance is whether CVS Foods, the debtor corporation, is "little more than a legal fiction." *Pearson v. Component Tech. Corp.*, 247 F.3d 471, 485 (3d Cir. 2001). Castle Cheese can hold MS Produce liable for CVS Foods' debt by showing that, "in all aspects of the[ir] business, the two corporations actually functioned as a single entity and should be treated as such." *Id.* Given the court's conclusion that Castle Cheese is entitled to summary judgment with respect to its breach of contract claim against CVS Foods, the liability of CVS Foods to Castle Cheese for $152,328.00 is no longer subject to dispute. Hence, Castle Cheese need only establish that MS Produce was the alter ego of CVS Foods in order to hold MS Produce liable for CVS Foods' debt.

There is ample evidence to support Castle Cheese's theory of alter ego liability. In his affidavit, Myrter stated that, on January 25, 2004, "MS Produce contacted Castle Cheese and informed Castle Cheese that, in the future, *MS Produce* intended to operate or conduct *its* cheese business under the *name* CVS Foods." (Myrter Aff.¶ 9 (emphasis added).) Although MS Produce disputes Myrter's claim, the court must view the evidence in the light most favorable to Castle Cheese, the nonmoving party. If Myrter's statement is believed, it would establish that MS Produce *itself* asserted that it was the *same entity* as CVS Foods.

Castle Cheese's position is further bolstered by Dunham's testimony. Dunham, who had worked for Kubeck, explained that, in his view, there was no real distinction between MS Produce and CVS Foods. (First Dunham Dep. 21.) According to him, MS Produce and CVS Foods were both located at 8500 West 47th Street in Lyons, Illinois. (Supp. Dunham Dep. 36.) The employees of each entity worked in the same office. (*Id.*) His office was the same when he performed tasks for CVS Foods (after January 1, 2004) as it was when he performed tasks for MS Produce (before January 1, 2004). (*Id.* 37.) He testified that the letterhead for the purchases of products from Castle Cheese and Whitehall was the only thing that had changed in January 2004, when the responsibility for purchasing and processing imitation cheese products switched from MS Produce to CVS Foods. (*Id.* 82.)

Zavacki also testified that there had been no meaningful distinction between MS Produce and CVS Foods. He explained:

Q.    Did you ever personally make a distinction between any of the Kubeck entities?

[Objection to the form of the question noted on the record].

A.   In the early stages I thought there might be some separation, and I thought that they could be independent, but they never operated that way.

Q.   All right.  When you say they never operated that way, can you explain for me what you mean by that?

A.   They were in the same building, they were the same people, they were the same decision-makers, same people in charge, same computer systems, same offices, same trucks, same warehouse, same phone system. Everything was exactly the same.  I was there.

Q.   Pardon me?

A.   I was there.  I physically saw it.

Q.   And that answer, your last answer was based on your personal observation?

A.   Yes.

(Supp. Zavacki Dep. 90-91.)  Zavacki's testimony constitutes evidence that MS Produce and CVS Foods shared assets and employees.  Kotz testified that while she had always been an MS Produce employee and had never been a CVS Foods employee, she had sometimes performed tasks for CVS Foods because both entities shared the same building.  (Kotz Dep. 61.)  The evidence of record can be used to establish the existence of an alter ego relationship.  *Galgay v. Gangloff*, 677 F.Supp. 295, 300 (M.D.Pa. 1987).

There are also some undisputed facts which tend to support Castle Cheese's position that CVS Foods was simply the alter ego of MS Produce.  MS Produce trucks were used to transport processed imitation cheese products from Lyons to Elgin for the entire five-month period at issue whether Grater was purchasing the products from MS Produce or CVS Foods.  It is undisputed that CVS Foods was grossly undercapitalized and, since the commencement of this litigation, has been dissolved.  Although MS Produce had multiple customers, Kubeck testified that CVS

Foods' only customer was Grater. (Kubeck Dep. 44.) CVS Foods, of course, did not become active until January 1, 2004. Kubeck controlled both MS Produce and CVS Foods. Under these circumstances, a reasonable jury could very well conclude that CVS Foods was operated during the early portion of 2004 solely to serve as a buffer zone between MS Produce and Castle Cheese, thereby permitting MS Produce to reap the benefits of CVS Foods' relationships with Grater and Castle Cheese without incurring contractual liability for the debt admittedly owed to Castle Cheese.

The court acknowledges the existence of evidence supporting MS Produce's position. Kubeck testified that CVS Foods had become active to serve as a buying group for combined companies pursuant to a deal that he had made with Zavacki, and that it had collapsed solely because of Zavacki's failure to follow through with his end of the bargain. (Kubeck Dep. 39.) MS Produce points out that 1) CVS Foods and it did not commingle their funds, 2) they had different Federal Employer Identification Numbers, dates of incorporation, and post office box numbers, and 3) they maintained separate financial statements. (Defs.' and Third-Party Pls.' Memorandum in Support of Mot. for Summ. J. (Doc. No. 197) 5-7.) On the record, the court concludes that there are genuine issues of material fact with respect to whether CVS Foods was an alter ego of MS Produce. Given the complex, fact-specific questions related to the alter ego issue, the question whether one corporation is an alter ego of another is typically treated as a question of fact. *Crane v. Green & Freedman Baking Co., Inc.*, 134 F.3d 17, 22-23 (1st Cir. 1998). Castle Cheese implicitly acknowledges that there are genuine issues of material fact, since it did not move for summary judgment with respect to its breach of contract claim against MS Produce. In the face of the conflicting evidence, the issues of fact will need to be decided by

a jury. It suffices to say that MS Produce is not entitled to summary judgment, and that the evidence of record compels the denial of its motion for summary judgment with respect to the breach of contract claim brought against it by Castle Cheese.

**B.     The Intentional Misrepresentation and Intentional Non-disclosure Claims**

Castle Cheese alleges that MS Produce committed the torts of intentional misrepresentation and intentional non-disclosure, and that CVS Foods committed the tort of intentional non-disclosure. (Am. Compl. (Doc No. 101) ¶¶ 33-47, 61-67.) MS Produce and CVS Foods move for summary judgment with respect to these claims. (Defs.' and Third-Party Pls.' Memorandum in Support of Mot. for Summ. J. (Doc. No. 197) 2-3, 8-9.) Castle Cheese contends that genuine issues of material fact exist as to these claims, and that MS Produce and CVS Foods are not entitled to summary judgment. (Memorandum of Law in Opp'n to Defs.' Mot. for Summ. J. (Doc. No. 227) 13.)

In order to assert a claim for intentional misrepresentation under Pennsylvania law, a plaintiff must establish that: (1) there was a representation made by the defendant to the plaintiff concerning a transaction; (2) the representation was material to the transaction; (3) the representation was false; (4) the defendant made the representation either with knowledge of its falsity or with reckless disregard as to whether it was false or not; (5) the defendant intended to mislead the plaintiff into relying on the representation; (6) the plaintiff relied on the representation; (7) the plaintiff's reliance on the representation was justified; (8) the plaintiff suffered an injury; and (9) the injury was proximately caused by the plaintiff's reliance on the

defendant's representation.[29]  *Bortz v. Noon*, 729 A.2d 555, 560 (Pa. 1999).  The tort of

intentional non-disclosure has the same elements as the tort of intentional misrepresentation

except that, instead of establishing an affirmative *representation* on the part of the defendant, the

plaintiff must establish that the defendant *concealed* information from the plaintiff.  *Gibbs v.

Ernst*, 647 A.2d 882, 889 (Pa. 1994).  In either case, the plaintiff must establish that he or she

was misled by the defendant (i.e., by act or omission).  These two torts are close cousins for a

reason.  In many instances, a misrepresentation can result from *both* an affirmative representation

*and* a concealment of material information.  Sometimes a duty to disclose information arises

directly from an affirmative representation.  In other words, one who *speaks* the truth, but

nevertheless *conceals* material information, can be held liable for misrepresentation even if, in

the absence of his or her speech, the speaker would be under no duty to disclose the relevant

information.  *See Rogers v. Warden*, 125 P.2d 7, 9 (Cal. 1942)("But the rule has long been settled

in this state that although one may be under no duty to speak as to a matter, if he undertakes to do

so, either voluntarily or in response to inquiries, he is bound not only to state truly what he tells

but also not to suppress or conceal any facts within his knowledge which materially qualify those

stated.  If he speaks at all he must make a full and fair disclosure.")(internal quotation marks

omitted).

　　　　Castle Cheese's intentional misrepresentation claim is based on allegations that MS

Produce affirmatively misled Castle Cheese personnel into believing that MS Produce was the

---

[29]The Pennsylvania Supreme Court listed only six elements.  *Bortz v. Noon*, 729 A.2d 555, 560 (Pa. 1999).
The court considers three of those six elements to include two distinct components, and has separated these elements
into distinct components in order to provide a clearer analysis in this case.  For instance, the actual falsity of a
representation is a different issue from the state of the mind of the defendant who makes the representation, even
though the Pennsylvania Supreme Court incorporated both issues within a single element.

same entity as CVS Foods, and that MS Produce was doing business under the trade or fictitious

name of CVS Foods. (Am. Compl. (Doc. No. 101) ¶ 34.) Castle Cheese's intentional non-

disclosure claims are based on allegations that MS Produce and CVS Foods both concealed the

fact that they were distinct corporate entities, as well as the fact that CVS Foods was not able to

pay for the products ordered from Castle Cheese. (*Id.* ¶¶ 42-45, 62-65.) The crux of the

argument raised by MS Produce and CVS Foods in support of their motion for summary

judgment with respect to these claims is their assertion that they had no duty to inform Castle

Cheese about their separate corporate status because they had no fiduciary relationship with

Castle Cheese, and because that information was in the public domain. (Defs.' and Third-Party

Pls.' Memorandum in Support of Mot. for Summ. J. (Doc. No. 197) 8-9.) The court finds their

argument to be unpersuasive under the circumstances of this case.

MS Produce and CVS Foods argue that they had no duty to disclose their separate

corporate status because they had no fiduciary relationship with Castle Cheese. The only

authority that they offer in support of their novel argument is the 1965 decision of the

Pennsylvania Court of Common Pleas of Allegheny County in *Spiegel v. Greenberg*, 38 Pa. D. &

C. 185 (Pa. Ct. Comm. Pl. 1965). That decision, however, provides no support for their position.

In *Spiegel*, the court determined that a fiduciary relationship between two co-venturers imposed

an affirmative duty on one to disclose the worth of a venture to the other. *Spiegel*, 38 Pa. D. &

C. at 189-90. *Spiegel* does not stand for the proposition that a fiduciary relationship is somehow

a prerequisite to an action for intentional misrepresentation or intentional non-disclosure. The

Pennsylvania Supreme Court has not included the existence of a fiduciary relationship between

the contracting parties as an element of either cause of action. *Bortz*, 729 A.2d at 560. For

purposes of the torts of intentional misrepresentation and intentional non-disclosure, it makes no difference whether the transaction involves two fiduciaries or whether it is merely an "arm's length" transaction involving two parties with no fiduciary relationship with one another. The argument to the contrary made by MS Produce and CVS Foods is without merit.

MS Produce and CVS Foods also argue that their separate corporate status was in the public domain, thereby obviating the need for them affirmatively to inform Castle Cheese that they were not the same entity. (Defs.' and Third-Party Pls.' Reply in Support of Mot. for Summ. Judgement Regarding Castle Cheese (Doc. No. 255) 9-10.) The court notes that this argument, even if meritorious with respect to the status of these two entities, would nevertheless fail to address Castle Cheese's allegations concerning their failure to disclose CVS Foods' inability to pay for the imitation cheese products ordered from Castle Cheese. In any event, the argument is unpersuasive with respect to both issues. In his affidavit, Myrter stated that MS Produce had affirmatively informed Castle Cheese that *it* (i.e., MS Produce) intended to conduct its cheese business under the *name* of CVS Foods. (Myrter Aff. ¶ 9.) Even if the court were to assume *arguendo* that no duty to disclose the separate corporate status of MS Produce and CVS Foods would have existed in the absence of an affirmative representation to the contrary, such a duty clearly arose after MS Produce advised Castle Cheese that MS Produce and CVS Foods were in essence the same entity. *Rogers*, 125 P.2d at 9. Of course, the court must credit Myrter's affidavit at this stage, since Castle Cheese is the nonmoving party.

Even aside from Myrter's affidavit, the record contains ample evidence that MS Produce personnel had indicated to Castle Cheese personnel that MS Produce and CVS Foods were really

the same entity.  Kubeck accused Dunham of making such a representation to Castle Cheese

personnel when he testified as follows:

> Q.  Did CVS Foods ever complete a credit application for Castle Cheese?
>
> A.  I don't think so, but I don't know.  I don't know if–I know there's some confusion–there was some confusion about an FEIN number.  There was some–there was some–I know that–I think I talked to a guy, the guy that sent me a bottle of Jack Daniels the Christmas of 2003–not this guy–Willy.  I think I talked to him, and he asked me about CVS Foods and he says, "Is it a different company?"  And I said, "It's a completely different company."  And he informed me that–I think this may have been late January.  He said that Dunham had told him that it was the same company, and absolutely that's not the case.  It was a completely different company.  Zavacki and I were contemplating CVS as a completely different company, and, in fact, it was.  It had a separate FEIN number.
>
> Q.  So at the end of January, 2004, Dunham–Willy Jacobs told you that Dunham had told him that CVS Foods was the same company as MS Produce?
>
> A.  That's what–that's what–the guy that bought me the Jack Daniels, I think his name was Willy.  There's only–there's only two guys that I recall and I didn't recall Joe until he walked into the room.  But Willy was the other guy.  I think–I think it was him.  And whoever it is, he did–he did tell me that, and I immediately–I immediately corrected that.  And that was before CVS ever started purchasing or taking stuff directly.
>
> Q.  Do you know how Willy Jacobs even knew of the existence of CVS Foods at that point?
>
> [Objection to the form of the question noted on the record].
>
> A.  Yeah, I would assume it was because we–we went over that with Castle people and Grater people, particularly because of the tightness of the–you know, there was only six weeks left in 2003.  We said, you know, we're not quite set up to do this right now.  There's a contemplated, you know, transition here.  So MS Produce is going to buy it.  And then after the first of the year, CVS is going to buy it.  And I remember that–I think it was late January where there was a–there was an order that came in for MS Produce and it was supposed to be a CVS order and I raised hell about that because it wasn't supposed to be like that.  And–but by that time, it was

a–Dunham was somewhat of a problematic guy because there was a problem with the K4/Grater contract by that time.

Q.    Did Mr. Jacobs tell you when Dunham had told him that MS Produce and CVS Foods were one and the same company?

A.    No.

Q.    So you don't know if Dunham told him that while employed by MS Produce?

A.    It would–I would–no, it would not–the issue wouldn't have come up until after January 1 because that's when we were supposed to do the cutover. So it had to be post-January 1 and he would have been an employee then of K4.

Q.    Why do you say that?  Why do you say it would have had to have been after January 1?

A.    Because the–because the CVS deal was not supposed to take effect until January 1.  So that transition would have had to take place post-January 1.

Q.    But that's pure speculation on your part; you don't know that for sure as you sit here today?

[Objection to the form of the question noted on the record].

A.    No, I don't–I don't recall if Dunham actually told me that.  Anna may have told me that.  I'm not sure if Dunham did.

Q.    After this conversation that you had with Willy in late January, 2004, did you go and ask Dunham about this conversation you had with Willy?

A.    Oh, yeah.

Q.    And what did Dunham tell you?

A.    He said–he said, "I never told Willy that MS Produce was part of CVS.  I told him exactly what I was doing–you know, what I was supposed to tell him, and, that is, that CVS was going to take over the purchasing and the processing and the only thing MS Produce was going to do was manage the process because it was in the warehouse of MS Produce and we're

> going to provide the transportation." I said, "So you told Willy that or you told Castle that?" And he said, "Yes, and, also, I told Whitehall that."

(Kubeck Dep. 93-97.) Kubeck's testimony is somewhat consistent with Myrter's affidavit, since both appear to demonstrate that MS Produce personnel had indicated to Castle Cheese personnel that MS Produce and CVS Foods were *not* separate entities.

In his own deposition, Dunham denied that he had ever spoken with Castle Cheese personnel about whether MS Produce and CVS Foods were the same entity (or separate entities). (First Dunham Dep. 86-88.) He also testified that he had never spoken with Kubeck or Kotz about whether Castle Cheese should be informed about the status of CVS Foods. (*Id.*) Thus, Kubeck's testimony is contradicted by that of Dunham. Both Myrter's affidavit and Kubeck's testimony provide support for Castle Cheese's allegation that, at some point, somebody working at the Lyons facility made an affirmative representation to Castle Cheese that MS Produce and CVS Foods were the same entity. Since MS Produce and CVS Foods specifically argue that they are *not* the same entity, they implicitly concede that any representation to the contrary was false. CVS Foods' inability to pay its debt to Castle Cheese (either because it genuinely had no money or because it fraudulently transferred its money to MS Produce) is undisputed. It is clear that both of these matters were material to Castle Cheese's decision to do business with CVS Foods. Indeed, Castle Cheese would not be in the position that it is in now had it not agreed to ship imitation cheese products to CVS Foods in January 2004.

There is a genuine issue of material fact concerning whether Castle Cheese's reliance on the representations made by MS Produce and CVS Foods was justified, given that a preexisting business relationship had already been in place, and that Castle Cheese's reliance on those

representations caused its injury. The intent of MS Produce and CVS Foods to mislead Castle

Cheese (either through MS Produce's affirmative representations or through both entities' non-

disclosure of material information) can be inferred from their conduct. *Sheffit v. Koff*, 100 A.2d

393, 395 (Pa.Super.Ct. 1953). Castle Cheese, of course, must present sufficient evidence of

untoward conduct on the part of MS Produce and CVS Foods from which that inference can be

drawn. *Pace v. Sagebrush Sales Co.*, 560 P.2d 789, 792-93 (Ariz. 1977). The record contains

ample evidence of questionable transfers and business practices to enable a reasonable finder of

fact to conclude that MS Produce and CVS Foods committed the torts of intentional

misrepresentation and intentional non-disclosure.

The court expresses no opinion about whether MS Produce and CVS Foods actually

misled Castle Cheese. It suffices to say that, based on the record in this case, a reasonable finder

of fact could find in favor of Castle Cheese with respect to the intentional misrepresentation

claim against MS Produce and the intentional non-disclosure claims against MS Produce and

CVS Foods. Consequently, with respect to such claims, the court must deny the motion for

summary judgment filed by MS Produce and CVS Foods.

## C.     The Civil Conspiracy Claims

MS Produce and CVS Foods move for summary judgment with respect to Castle

Cheese's civil conspiracy claims against them. (Defs.' and Third-Party Pls.' Memorandum in

Support of Mot. for Summ. J. (Doc. No. 197) 8-9.) Castle Cheese's civil conspiracy claims are

based upon allegations that MS Produce and CVS Foods conspired to mislead Castle Cheese into

believing that CVS Foods was merely a trade or fictitious name for MS Produce, thereby

inducing Castle Cheese to ship imitation cheese products (for which it would never be paid) to the Lyons facility. (Am. Compl. (Doc. No. 101) ¶¶ 48-52, 68-72.)

In order to establish liability for civil conspiracy, Castle Cheese must show that: (1) MS Produce and CVS Foods conspired with a common purpose to do (a) an unlawful act, or (b) a lawful act by unlawful means or for an unlawful purpose; (2) MS Produce and CVS Foods committed an overt act in furtherance of the conspiracy; and (3) Castle Cheese suffered legal damages as a result of the overt act committed in furtherance of the conspiracy. *Weaver v. Franklin County*, 918 A.2d 194, 202 (Pa. Commw. Ct. 2007). For purposes of this claim, the phrases "unlawful act" and "lawful act by unlawful means or for an unlawful purpose" refer to acts that are independently actionable under Pennsylvania law. "[A]bsent a civil cause of action for a particular act, there can be no cause of action for civil conspiracy to commit that act." *Pelagatti v. Cohen*, 536 A.2d 1337, 1342 (Pa. Super. Ct. 1987). A claim for civil conspiracy cannot stand without some underlying act which is actionable in and of itself. *McKeeman v. Corestates Bank, N.A.*, 751 A.2d 655, 660 (Pa. Super. Ct. 2000)("Because we have concluded that preliminary objection was properly granted with regard to the conversion claim, there can be no cause of action for civil conspiracy here based on that claim.").

Castle Cheese argues that its civil conspiracy claims are based on a conspiracy between MS Produce and CVS Foods to commit the torts of intentional misrepresentation and intentional non-disclosure, and to commit fraudulent transfers in violation of the PUFTA. (Memorandum of Law in Opp'n to Defs.' Mot. for Summ. J. (Doc. No. 227) 13.) MS Produce and CVS Foods do not advance arguments in favor of summary judgment with respect to the civil conspiracy claims other than those which the court has already rejected with respect to the intentional

73

misrepresentation and intentional non-disclosure claims. They apparently believe that Castle Cheese's civil conspiracy claims must be dismissed because of Castle Cheese's inability to assert underlying claims. (Defs.' and Third-Party Pls.' Memorandum in Support of Mot. for Summ. J. (Doc. No. 197) 8-9.) The record contains sufficient evidence of underlying torts (i.e., PUFTA violations, intentional misrepresentation and intentional non-disclosure) to allow Castle Cheese to overcome this hurdle with respect to its civil conspiracy claims.

It is undisputed that Castle Cheese suffered legal damages in the amount of $152,328.00 as a result of CVS Foods' failure or inability to pay its debt for imitation cheese products. CVS Foods' ordering and purchasing of imitation cheese products from Castle Cheese constituted a series of overt acts in furtherance of the alleged conspiracy. The same could potentially be true of the three transfers of money from CVS Foods to MS Produce, which totaled $110,000.00. MS Produce and CVS Foods *agreeing* to take those actions (leaving aside the legality of those actions) is hardly subject to dispute, since both were controlled by the same people. Kubeck testified about the intricate relationship between MS Produce and CVS Foods, including the reasons for the transfers. (Kubeck Dep. 115-16.) Much of Kubeck's testimony is contradicted by evidence contained in the record. Zavacki testified that, in his view, Kubeck had fabricated invoices to provide a retroactive explanation for the payments made by CVS Foods to MS Produce. (Supp. Zavacki Dep. 54.) Dunham testified that he had not created the invoices in question during his employment with the Kubeck entities, and that those invoices had to have been prepared *after* the commencement of his employment relationship with Grater. (Supp. Dunham Dep. 72.)

Under these circumstances, a reasonable finder of fact could conclude that MS Produce and CVS Foods committed the tort of civil conspiracy by conspiring to misrepresent their corporate status to Castle Cheese, to fail to advise Castle Cheese of CVS Foods' inability to pay for future shipments of imitation cheese products, and to commit fraudulent transfers of money in violation of the PUFTA. MS Produce and CVS Foods are not entitled to summary judgment with respect to Castle Cheese's civil conspiracy claims, and their motion for summary judgment must be denied with respect to those claims. In so holding, the court emphasizes that, at this stage, the evidence is viewed in the light most favorable to Castle Cheese, the nonmoving party. No opinion is expressed about whether MS Produce and CVS Foods did, in fact, conspire to defraud Castle Cheese. That question will be resolved by the finder of fact.

### III. The Cross-Motions for Summary Judgment With Respect to Third-Party Complaint

MS Produce and CVS Foods assert third-party claims against Grater, alleging that Grater is liable for all or part of the damages owed to Castle Cheese. (Am. Third-Party Compl. (Doc. No. 29) ¶ 29.) This assertion is based on the alleged existence of an agency relationship between Grater, MS Produce and CVS Foods. (*Id.* ¶ 28.) MS Produce and CVS Foods have been somewhat vague as to the precise legal bases for their third-party claims. At the summary judgment stage, they move for summary judgment against Grater with respect to what appear to be distinct claims for breach of contract and quantum meruit. (Defs.' and Third-Party Pls.' Memorandum in Support of Mot. for Summ. J. (Doc. No. 197) 9-15.) Those claims, however, do not appear in the Am. third-party complaint. (Am. Third-Party Compl. (Doc. No. 29).) At most, they are alluded to by a very general averment alleging that Grater has refused to pay CVS Foods

for outstanding invoices for imitation cheese products.  (*Id.* ¶ 27.)  Pending before the court are cross-motions for summary judgment concerning the third-party claims brought by MS Produce and CVS Foods against Grater.

Dunham testified that, in December 2005, Grater wrote off $62,292.00 from its accounts payable that was owed to CVS Foods for imitation cheese invoices.  (First Dunham Dep. 68.) According to him, this sum of money was not paid because Zavacki and Kubeck were disputing a consulting contract between K4 and Grater.  (*Id.* 134.)  Kubeck had allegedly claimed that he was owed $500,000.00 from Grater, but Grater disputed that claim.  (*Id.*)  Grater appears to have viewed the $62,292.00 on its accounts payable as money used to offset debts owed by Kubeck to Grater.

In his deposition, Zavacki acknowledged that Dunham had testified about the writing off of $62,292.00 in imitation cheese bills allegedly owed by Grater to CVS Foods.  (First Zavacki Dep. 109.)  He disputed that the money was actually owed on various grounds.  He made it clear that, as far as he was concerned, Kubeck's entities were one and the same.  (*Id.* 110.)  He did not distinguish between K4, MS Produce and CVS Foods.  (*Id.*)  He testified that MS Produce had not paid for cheese which had been supplied by Grater (apparently related to MS Produce's efforts to meet Arby's' cheese specifications), and that Kubeck and he had agreed to offset that debt against the debt allegedly owed by CVS Foods to Grater.  (*Id.*)  Zavacki stated that he had made a $375,000.00 payment to MS Produce for cheese bills, and that Kubeck had not accounted for that money.[30]  (*Id.*)

---

[30]According to Zavacki, he made the $375,000.00 payment with the expectation that he would obtain a controlling interest in MS Produce, but Kubeck later informed him that this arrangement would not be actualized. (First Zavacki Dep. 48.)

Zavacki testified about invoices from CVS Foods to Grater worth approximately $62,800.00 that Grater never received. (*Id.* 172-207.) He insisted that Grater did not owe the money because of offsets related to Grater's previous cheese sales to MS Produce, which enabled MS Produce to meet the cheese specifications required by Arby's. (*Id.* 207.) Grater does not dispute that it received the imitation cheese products for which it was apparently never invoiced. Grater's receipt of products provides the basis for the quantum meruit claims asserted by MS Produce and CVS Foods against Grater, which seek damages in the amount of $62,800.00. (Defs.' and Third-Party Pls.' Memorandum in Support of Mot. for Summ. J. (Doc. No. 197) 12-15.) Pennsylvania recognizes a cause of action for quantum meruit, which is designed to prevent one party's unjust enrichment at the expense of another. *Northeast Fence & Iron Works, Inc. v. Murphy Quigley Co., Inc.*, 933 A.2d 664, 667 (Pa. Super. Ct. 2007).

Grater contends that the claims asserted by MS Produce and CVS Foods for the $62,292.00 in unpaid imitation cheese bills and the $62,800.00 in quantum meruit have not been fairly set forth in the amended third-party complaint and are not properly before the court. (Grater, Inc.'s Memorandum in Opp'n to Defs.'/Third-Party Pls.' Mot. for Summ. J. (Doc. No. 232) 4-7.) MS Produce and CVS Foods argue that they have sufficiently alleged Grater's failure to pay bills to put Grater on notice of the claims against it. (Defs.' and Third-Party Pls.' Reply in Support of Mot. for Summ. J. Regarding Grater (Doc. No. 274) 4-8.) For purposes of the cross-motions for summary judgment, the court must look beyond the conclusory assertions of the parties and break the vague allegations down into discrete claims. In so doing, the court is mindful of two determinations which have already been made. First, the court has already determined that CVS Foods is liable to Castle Cheese for $152,328.00 pursuant to a breach of

contract claim.[31]  Second, the court has concluded that while no reasonable jury could conclude

that the *existence* of an agency relationship was disclosed to Castle Cheese, a genuine issue of

material fact exists concerning whether an agency relationship actually existed (even though

Castle Cheese was not aware of it).  With those holdings in mind, the court will proceed to

analyze the third-party claims at issue in this case.

Federal Rule of Civil Procedure 14(a) permits a defending party to "serve a summons and

complaint on a nonparty who is or may be liable to it for all or part of the claim against it."

FED.R.CIV.P. 14(a).  Federal Rule of Civil Procedure 18(a) provides that "[a] party asserting a

claim, counterclaim, crossclaim, or third-party claim may join, as independent or alternative

claims, as many claims as it has against an opposing party."  FED.R.CIV.P. 18(a).  In *Schwab v.*

*Erie Lackawanna Railroad Co.*, 438 F.2d 62, 65-71 (3d Cir. 1971), the United States Court of

Appeals for the Third Circuit explained that these two rules must be construed together rather

than in isolation.  Consequently, as long as MS Produce and CVS Foods can properly pursue

third-party claims against Grater which are derivative of their own liability to Castle Cheese

under Rule 14(a), Rule 18(a) provides a way for them to pursue their breach of contract (i.e., the

failure of Grater to pay the invoices totaling $62,292.00) and quantum meruit (i.e., the failure of

---

[31]The court reads the amended third-party complaint as being based on an allegation that Grater is liable for
the *debt* owed to Castle Cheese.  (Am. Third-Party Compl. (Doc. No. 29) ¶¶ 27-29.)  The court does not construe
the pleadings to contain allegations that Grater is somehow liable for any *torts* committed by MS Produce or CVS
Foods.  MS Produce and CVS Foods specifically argue that "Pennsylvania law has recognized claims for
contribution *outside* of actions based on tort law."  (Defs.' and Third-Party Pls.' Resp. in Opp'n to Grater, Inc.'s
Mot. for Summ. J. (Doc. No. 257) 15 (emphasis in original).)  Thus, they do not argue that their third-party claims
are based on tort theories of joint and several liability.  The court expresses no opinion about the viability of those
claims in this case.  To the extent that MS Produce and CVS Foods believe that they stated claims against Grater
pursuant to tort liability theories, they have not sufficiently set forth those theories in their pleadings to put Grater on
fair notice about the claims against it.  The court notes that when the amended third-party complaint was filed, Castle
Cheese had not yet asserted PUFTA claims against MS Produce and CVS Foods.  Therefore, it is clear that the third-
party complaint is not based on the PUFTA.

Grater to pay $62,800.00 for the imitation cheese products that it received, but for which it did not receive invoices) claims against Grater.

In order to pursue a valid third-party claim, however, a third-party plaintiff must establish the existence of a cognizable claim under the applicable substantive law. *See Gen. Dynamics Corp. v. Adams*, 340 F.2d 271, 279 (5th Cir. 1965). Since Rule 14(a) is merely procedural, it is not itself the *source* of a third-party claim. *See Price v. CTB, Inc.*, 168 F.Supp.2d 1299, 1301 (M.D.Ala. 2001). Instead, it provides a procedural mechanism through which a third-party plaintiff can pursue an otherwise cognizable third-party claim. A third-party claim can be pursued under Rule 14(a) only if the alleged liability of the third-party defendant is somehow derivative of the defendant/third-party plaintiff's liability to the plaintiff in the original suit. Thus, a third party cannot be sued by a defendant/third-party plaintiff under Rule 14(a) merely because it, too, may be directly liable to the same plaintiff. *Chao v. N.J. Licensed Beverage Ass'n*, 461 F.Supp.2d 303, 306-307 (D.N.J. 2006).

MS Produce and CVS Foods devote much of their arguments to explanations about why Grater, as an alleged principal, is liable for the debt owed to Castle Cheese. Grater's potential liability to *Castle Cheese*, however, is largely irrelevant. Castle Cheese has not sued Grater. Had MS Produce or CVS Foods acted on behalf of a *disclosed* principal (i.e., acted in such a way that *both* the existence of the agency relationship *and* the identity of the principal were known to Castle Cheese), MS Produce or CVS Foods could not be deemed a party to the contract with Castle Cheese and, hence, could not be liable for breaching it. *Viso*, 369 A.2d at 1187. The court has already concluded that no evidence supports the proposition that Castle Cheese knew of an agency relationship, even if it is assumed *arguendo* that such a relationship existed.

Consequently, CVS Foods (an alleged agent for an undisclosed principal) is *itself* liable for breaching the contract with Castle Cheese. *Burton*, 489 A.2d at 245. The question, then, is whether CVS Foods (and, potentially, MS Produce, if MS Produce is deemed to be the alter ego of CVS Foods) is entitled to contribution from Grater for a share of the $152,328.00 debt.

Unlike many other jurisdictions, Pennsylvania provides for joint and several liability in circumstances in which an agent acting on behalf of an undisclosed principal breaches a contractual obligation owed to a third party. *Brennan v. Huber*, 171 A. 122, 123 (Pa.Super.Ct. 1934). In the event of a breach by the agent, the third party may proceed against the agent, the undisclosed principal, or both. *Joseph Melnick Bldg. & Loan Ass'n v. Melnick*, 64 A.2d 773, 777 (Pa. 1949). If it is assumed that CVS Foods was, in fact, Grater's agent, Castle Cheese could proceed against CVS Foods, Grater, or both. It does not follow that CVS Foods is entitled to *contribution* from Grater for its pro rata share of the $152,328.00 owed to Castle Cheese. CVS Foods' entitlement to contribution is a separate issue from Grater's amenability to suit for CVS Foods' breach of the contract.

MS Produce and CVS Foods argue that Pennsylvania law recognizes claims for contribution *outside* of the tort law context. In support of their argument, they rely on the Pennsylvania Supreme Court's decision in *City National Bank of Wichita Falls v. Atkinson*, 175 A. 507 (Pa. 1934).[32] In *Atkinson*, the Pennsylvania Supreme Court recognized that one joint debtor had a right of contribution from another. *Id.* That decision, however, was issued prior to

---

[32]MS Produce and CVS Foods also rely on *Seither v. Philadelphia Traction Co.*, 17 A. 338 (Pa. 1889). *Seither*, however, provides no support for their position. They have apparently confused an argument raised by counsel for one of the parties in that case with the Pennsylvania Supreme Court's recognition of that argument as valid.

the enactment of Pennsylvania's Uniform Contribution Among Tort-feasors Act ("Joint Tort-feasors Act"), 42 Pa. Cons. Stat. §§ 8321 *et seq.* The Joint Tort-feasors Act defines "joint tort-feasors" as "two or more persons jointly or severally liable *in tort* for the same injury to persons or property, whether or not judgment has been recovered against all or some of them." 42 Pa. Cons. Stat. § 8322 (emphasis added). The Joint Tort-feasors Act's substantive provisions provide a joint tort-feasor with a right of contribution from another if he or she has paid more than his or her pro rata share of the damages caused by the acts of both tort-feasors. 42 Pa. Cons. Stat. § 8324. CVS Foods does not argue that its liability (and MS Produce does not argue that its potential liability) for the debt owed to Castle Cheese resulted from tortious conduct. It is undisputed that Castle Cheese's claims related to the $152,328.00 debt sound in breach of contract. Thus, the Joint Tort-feasors Act is inapplicable to this case.

MS Produce and CVS Foods contend that a right of contribution exists under Pennsylvania law independent of the Joint Tort-feasors Act. The court's examination of the issue reveals that their contention is incorrect. In *Kemper National P & C Companies v. Smith*, 615 A.2d 372 (Pa. Super. Ct. 1992), the Pennsylvania Superior Court declared that "the right[] of contribution and apportionment of liability among multiple defendants is a matter which is governed exclusively by statute in Pennsylvania." *Id.* at 379. Consequently, a right of contribution under Pennsylvania law can exist only pursuant to the Joint Tort-feasors Act. *IAP Worldwide Services, Inc. v. UTi U. S., Inc.*, CV-04-4218, 2006 U.S. Dist. LEXIS 4766, at *40-46 (E.D.Pa. Feb. 8, 2006). CVS Foods does not argue that either Grater or it meets the definition of the term "joint tort-feasors" appearing in the Joint Tort-feasors Act. Since the enactment of that statute, courts have consistently held that Pennsylvania does not recognize a right of contribution

among defendants in breach of contract cases. *Agere Sys., Inc. v. Advanced Environmental Tech. Corp.*, 552 F.Supp.2d 515, 527 (E.D.Pa. 2008); *Pride Mobility Prods. Corp. v. Dewert Motorized Sys.*, CV-05-807, 2006 U.S. Dist. LEXIS 48497, at *11-12 (M.D.Pa. July 17, 2006); *Unique Technologies, Inc. v. Micro-Stamping Corp.*, CV-02-6649, 2003 U.S. Dist. LEXIS 12060, at *9 (E.D.Pa. Apr. 15, 2003).  Therefore, MS Produce and CVS Foods cannot pursue contribution claims against Grater.

The Joint Tort-feasors Act does not affect any common law rights to indemnification to which MS Produce or CVS Foods may be entitled under Pennsylvania law.  42 PA. CONS. STAT. § 8323.  Pennsylvania law recognizes indemnity as "a fault-shifting mechanism that comes into play when a defendant held liable by operation of law seeks to recover from a defendant whose conduct actually caused the loss."  *City of Wilkes-Barre v. Kaminski Bros., Inc.*, 804 A.2d 89, 92 (Pa. Commw. Ct. 2002).  "The right to indemnity arises by operation of law and will be allowed where necessary to prevent an unjust result.  It is a common law equitable remedy that shifts the entire responsibility for damages from a party who, without any fault, has been required to pay because of a legal relationship to the party at fault."  *Id.*  Indemnity is available where there is either a contractual provision or agreement expressly providing for indemnity or an instance of secondary liability for which justice requires a distinct party to bear the cost.  *Allegheny Gen. Hosp. v. Phillip Morris, Inc.*, 228 F.3d 429, 448 (3d Cir. 2000).  CVS Foods apparently believes that Grater is responsible for the debt owed to Castle Cheese because of the alleged agency relationship and Grater's alleged refusal to pay imitation cheese bills.

Grater points out that "the party seeking indemnification must pay the claim or verdict damages before obtaining any rights to pursue an indemnification recovery."  *Beary v. Container*

*Gen. Corp.*, 568 A.2d 190, 193 (Pa. Super. Ct. 1989). Rule 14(a), however, does not require

CVS Foods (or MS Produce, if it is found to be liable for breach of contract pursuant to an alter

ego theory) to establish Grater's *liability* in order to *pursue* a third-party claim. Instead, Rule

14(a) provides that a defending party "may cause a summons and complaint to be served upon a

person not a party to the action who is or *may be liable* to the third-party plaintiff for all or part

of the plaintiff's claim against the third-party plaintiff." FED.R.CIV.P. 14(a)(emphasis added).

This language has been construed to mean that a third-party plaintiff need not await the outcome

of the plaintiff's claim against it before asserting an indemnity claim against a third-party

defendant. *IHP Indus., Inc. v. PermAlert, ESP*, 178 F.R.D. 483, 487-88 (S.D.Miss. 1997). Thus,

Grater is not entitled to summary judgment with respect to the issue of indemnity solely because

CVS Foods or MS Produce has not paid damages to Castle Cheese.

      The court already concluded that there is a genuine issue of material fact with respect to

whether MS Produce and CVS Foods were acting as agents of Grater when they purchased and

processed imitation cheese products from Castle Cheese. Factual disputes also exist about

whether Grater's payments to CVS Foods (or to Kubeck's entities in a more collective sense)

were improperly applied to other debts (i.e., the consulting agreement between K4 and Grater).

The most vivid demonstration of this issue is check number 2405, which corresponds directly

with the total amount of specific invoices, but was apparently used by Kubeck for other purposes.

The court cannot determine, at the summary judgment stage, whether justice requires Grater to

indemnify CVS Foods (and possibly MS Produce) for the $152,328.00 debt owed to Castle

Cheese. That question will turn, in part, on the factual determinations concerning whether MS

Produce and CVS Foods were actually agents of Grater. Neither motion for summary judgment can be granted as to this issue, and both must be denied.

Since MS Produce and CVS Foods can pursue their indemnity claims pursuant to Rule 14(a), the court must determine whether to permit them to pursue their distinct breach of contract (i.e., the $62,292.00 in unpaid invoices) and quantum meruit (i.e., the $62,800.00 worth of imitation cheese products for which Grater was never invoiced) pursuant to Rule 18(a). As noted earlier, Rule 18(a) provides a procedural mechanism through which they may do so. It is clear to the court that these distinct claims (which have never been clearly stated in the filings in this case) concern a single subset of a much larger business dispute between Zavacki and Kubeck. The court is sympathetic to Grater's assertion that the vagueness of the third-party complaint, and the lack of specificity concerning the claims against Grater, have essentially deprived Grater of a meaningful opportunity to frame affirmative defenses and assert potential counterclaims. The court notes that when Zavacki was deposed, counsel for MS Produce and CVS Foods challenged his assertion that MS Produce owed Grater money for sliced cheese related to specifications provided by Arby's. (First Zavacki Dep. 207-10.) Counsel for Grater indicated that no counterclaims had been filed against MS Produce and CVS Foods because Grater had not viewed the breach of contract and quantum meruit issues to be pertinent to this case. (*Id.*)

If the court were to adjudicate these claims, it would do so on the basis of an incomplete record, since this action does not encompass the much larger dispute between Zavacki and Kubeck. Under 28 U.S.C. § 1367(c)(4), a federal district court may decline to exercise supplemental jurisdiction over a claim where, "in exceptional circumstances, there are . . . compelling reasons for declining jurisdiction." 28 U.S.C. § 1367(c)(4). Such "exceptional

circumstances" and "compelling reasons" are present in this case. The court notes that the larger disputes between Grater and the Kubeck entities are currently being litigated in the Illinois courts. Other federal courts have declined to exercise supplemental jurisdiction over state claims pursuant to section 1367(c)(4) where, as here, identical or similar claims have been pending in state court. *Che v. Massachusetts Bay Transp. Auth.*, 342 F.3d 31, 37 (1st Cir. 2003); *Hays County Guardian v. Supple*, 969 F.2d 111, 125 (5th Cir. 1992); *West Coast, Inc. v. Snohomish County*, 33 F.Supp.2d 924, 925-26 (W.D.Wash. 1999); *Blue Dane Simmental Corp. v. American Simmental Ass'n*, 952 F.Supp. 1399, 1413 (D.Neb. 1997); *Polaris Pool Sys. v. Letro Prod., Inc.*, 161 F.R.D. 422, 425 (C.D.Cal. 1995). This court will decline to exercise supplemental jurisdiction over the breach of contract and quantum meruit claims asserted by MS Produce and CVS Foods. MS Produce and CVS Foods are free to pursue their indemnity claims on a theory of agency, but the issue of Grater's liability will be limited to the question whether Grater is liable as a principal for the money owed by CVS Foods (and possibly MS Produce) for breaching the contract with Castle Cheese. Having been imprecise about the nature of their claims against Grater throughout this litigation, MS Produce and CVS Foods cannot continue to redefine their legal theories from one stage to the next, thereby creating palpable prejudice to Grater and unacceptable confusion for the court. If they wanted to pursue additional claims against Grater pursuant to Rule 18(a), they should have done so in a coherent manner.

### Conclusion

There is no dispute that Castle Cheese is owed $152,328.00, and there is no evidence that Castle Cheese was aware of the alleged agency relationship between MS Produce or CVS Foods and Grater when it shipped imitation cheese products to the Lyons facility. Consequently, Castle

Cheese is entitled to summary judgment with respect to its breach of contract claim against CVS Foods. Castle Cheese met its burden to show that $51,500.00 of the transfers at issue between CVS Foods and MS Produce were constructively fraudulent under the PUFTA, and that no reasonable jury could conclude to the contrary. Hence, Castle Cheese is entitled to summary judgment with respect to its PUFTA claims against MS Produce and CVS Foods in the amount of $51,500.00. The remaining $58,500.00 at issue will depend upon whether MS Produce provided CVS Foods with a reasonably equivalent value during the months of January, February and March 2004.

There is a genuine issue of material fact about whether MS Produce was the "alter ego" of CVS Foods. Genuine issues of material fact also exist with respect to whether MS Produce committed the tort of intentional misrepresentation and whether MS Produce and CVS Foods committed the torts of intentional non-disclosure and civil conspiracy. Consequently, the motion for summary judgment filed by MS Produce and CVS Foods must be denied in all respects.

Grater's motion for summary judgment must be granted with respect to the issue of contribution and denied with respect to the issue of indemnity. As noted earlier, while a genuine dispute exists about whether MS Produce and CVS Foods were acting as agents of Grater, contribution is available under Pennsylvania law only in accordance with the Joint Tort-feasors Act, which is clearly inapplicable to Castle Cheese's breach of contract claims. Because the amended third-party complaint failed to provide adequate notice to Grater that MS Produce and CVS Foods intended to pursue breach of contract and quantum meruit claims based on Grater's alleged failure to pay for imitation cheese products, the court declines to exercise supplemental jurisdiction over those claims pursuant to 28 U.S.C. § 1367(c)(4). MS Produce and CVS Foods

86

remain free to pursue their indemnity claims against Grater on the theory that they dealt with Castle Cheese solely in their capacities as Grater's agents. Grater would be prejudiced if the court were to permit MS Produce and CVS Foods to litigate additional claims which form only a small part of a larger business dispute between Kubeck and Zavacki. Such matters will be more appropriately addressed by the Illinois courts.

For these reasons, the motion for partial summary judgment filed by Castle Cheese (Doc. No. 181) is **GRANTED IN PART** and **DENIED IN PART**, the motion for summary judgment filed by MS Produce and CVS Foods (Doc. No. 188) is **DENIED**, and the motion for summary judgment filed by Grater (Doc. No. 230) is **GRANTED IN PART** and **DENIED IN PART**.

By the court:


/s/ JOY FLOWERS CONTI
Joy Flowers Conti
United States District Judge


Dated: September 19, 2008

cc: Counsel of Record